**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**J. P. STEVENS & CO., INC., et al., Respondents.**

**Nos. 654–657, Dockets 30914, 30391, 31164 and 31245.**

United States Court of Appeals, Second Circuit.

Argued April 19, 1972.

Decided July 13, 1972.

Jerome N. Weinstein, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul Elkind, Chief, Contempt Litigation, on brief), for petitioner.

Whiteford S. Blakeney, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for respondents.

Before FRIENDLY, Chief Judge, and WATERMAN and FEINBERG, Circuit Judges.

PER CURIAM:

The National Labor Relations Board has moved in this court for an order adjudging respondents J. P. Stevens & Co., Inc., Mason Lee, Edna Parrish, Marshall Cox, Tommy Gardner, Pete Rawlings and Max Bowers[1] in civil contempt for failing to comply with this court's decrees entered pursuant to our decisions in J. P. Stevens & Co. v. N. L. R. B., 380 F.2d 292 (2d Cir.), cert. denied, 389 U. S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967), and Textile Workers Union of America v. NLRB, 388 F.2d 896 (2d Cir. 1967), cert. denied sub nom. J. P. Stevens & Co. v. N. L. R. B., 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968). In those decisions we upheld the Board's determination that the Company had engaged in "massive violations" of sections

---

1. The individual respondents are all supervisory personnel.

8(a) (1), (3) and (4) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), (3) and (4), and we enforced with minor modifications the Board's orders requiring Stevens to comply with the Act. We are now faced with the charge that in many instances respondents have ignored or refused to comply with our earlier orders.

To help us adjudicate these charges we originally appointed the late Edwin M. Stanley, Chief Judge of the United States District Court for the Middle District of North Carolina, as Special Master to hear testimony and take evidence and to make determinations of fact and law on the issues raised. During March 1971, Judge Stanley held extensive hearings at which numerous witnesses testified, resulting in nearly 2,500 pages of transcript. Before the parties had completed the filing of briefs Judge Stanley died suddenly on December 23, 1971. We take this occasion to mourn the loss of a distinguished member of the federal bench.

With the death of Judge Stanley and in view of the long period of time that had elapsed since our prior orders, we decided that, rather than referring the case to a new master, the better course was for this court to resolve the issues on the present record after hearing oral argument from the parties. In reaching our decision, we have proceeded with caution because of the seriousness of the charges involved. We have carefully studied the Board's proposed findings and the briefs of the parties, and we have heard oral argument from them. After making an independent examination of the entire record, we have adopted only those findings suggested by the Board where we found that the Board had produced clear and convincing evidence in support of its allegations of contemptuous conduct. Conversely, we have rejected many proposed findings

when we found that standard of proof had not been met or when we thought the alleged misconduct too trivial or insignificant to constitute contempt of our orders. While an effort was made to resolve questions of fact by independent evidence, we were, at times, forced to resolve inevitable conflicts in testimony, i. e., the credibility of witnesses. In doing so, we have not considered that mere numerical superiority of witnesses advancing a particular version of the facts forced us to accept their account if we found the opposition's version more internally consistent, externally verifiable, or, on the whole, a far more plausible account of the events in question. Finally, more than might ordinarily be our practice we have adhered to the language of those proposed Board findings that we approve. We have done so not only because of the unusual posture of this case, already alluded to, but also to save time. Protection of the rights of the employees affected by respondents' continued unlawful conduct and the need for speedy vindication of this court's prior orders outweigh any considerations of style.

■ Our findings of fact and conclusions of law are attached as an appendix. As they make clear, respondents have flouted our prior decrees in many ways. In a continued attempt to dissuade employees from joining the Textile Workers Union of America, the Company and its management personnel in various plants, despite our prior orders, have continued to resort to such unlawful tactics as engaging in surveillance of organizing activities, interrogating employees about their union inclinations, threatening pro-union employees with discharge and other reprisals, discriminatorily altering their working conditions and discharging them because of their union sympathies.[2] In fact, one of the employees so discharged had been il-

---

2. A small portion of respondents' conduct referred to in the attached findings, principally involving Charles Epley, took place before our first decree was in effect

or while that decree was stayed for a brief period (see findings 1, 2 infra). Although such conduct was technically not contemptuous, most of it occurred after

legally terminated before, was reinstated by our prior order, but was then illegally discharged again. We regard this pattern of flagrantly contemptuous conduct most seriously. Our system of justice cannot survive if litigants are seized with the notion that they can ignore the lawful orders of a court simply because they may disagree with them. In addition, the record here strongly justifies the inference that these respondents deliberately took their chances in ignoring our decrees because they thought it profitable for them to do so. Finally, while conflicting testimony about a specific event may sometimes have been attributable to difference in perception or recollection, we cannot escape the impression that many conscious and deliberate falsehoods were given by company witnesses. We cannot express too sharply our condemnation and dismay for this apparent disregard of the legal and moral obligations which the testimonial oath imports.

 Accordingly, we direct that an order be entered adjudging respondents in civil contempt of this court and requiring them to purge themselves as set forth in the Board's prayer for relief consistent with the attached findings and conclusions, including offering immediate and full reinstatement with back pay to those employees who have been unlawfully discharged, posting a notice in respondents' plants in North and South Carolina for 60 days notifying the employees of this decision, and paying to the Board all costs and expenses, including counsel fees and salaries, incurred by the Board as a result of these proceedings.

The Board shall submit a proposed order within 15 days after the filing of this opinion. Respondents may submit a counter-order within a like period thereafter.

our first opinion in early July 1967. In any event, the conduct was relevant to the issue of anti-union animus in related

# APPENDIX

## I. FINDINGS OF FACT

### A. *The Underlying Decrees*

1. On September 1, 1967, this court entered its decree in Nos. 30,914 and 30,391 (J. P. Stevens & Co. v. NLRB, 380 F.2d 292 (2d Cir.)) enforcing an order of the Board issued on March 22, 1966. By our decree, this court ordered, *inter alia*, that J. P. Stevens & Company, Inc., its officers, agents, successors and assigns:

Cease and desist from:

(a) Discharging, forcing the termination of, refusing overtime work to, or otherwise discriminating against employees in order to discourage membership in Textile Workers Union of America, AFL–CIO ["Union"] or any other labor organization.

(b) Discharging or otherwise discriminating against employees for giving testimony under the Act.

(c) Engaging in surveillance of employees' activity in respect to union organization.

(d) Interrogating any employee concerning such union activity by him or other employees.

(e) Threatening its employees with discharge or other reprisals if they become or remain members of the Union or give any assistance or support to it.

(f) Altering its working conditions for the purpose of defeating the organizational efforts of its employees or of [the Union], or the efforts of any other labor organization of its employees.

(g) Encouraging or permitting employees to engage in anti-union activity while prohibiting employees from engaging in activity on behalf of the Union.

conduct occurring while our decrees were in force.

(h) Interrogating and intimidating employees concerning statements the employees gave to Board agents.

(i) Encouraging and assisting employees in withdrawing from the Union.

(j) Instructing employees to watch for and report to the Company the union activities of other employees.

(k) Requiring its employees to remove and prohibiting its employees from wearing Union insignia or threatening its employees with discharge for wearing Union insignia in its plants.

(l) Intimidating and coercing employees into withdrawing from the Union.

(m) In any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form, join, or assist [the Union], or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or mutual aid or protection, or to refrain from any or all such activities.

2. This decree, entered September 1, 1967, was stayed by this court on October 7, 1967, pending the Supreme Court's disposition of the Company's petition for certiorari, which was denied on December 11, 1967. J. P. Stevens & Co. v. NLRB, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600. At all other times said decree has been in full force and effect since its entry. At all material times herein the Company and the other named respondents had notice and knowledge of its terms.

3. On March 26, 1968, this court entered its decree in Nos. 31,164 and 31,245 (Textile Workers Union of America v. NLRB, 388 F.2d 896 (2d Cir.)), enforcing an order of the Board, dated March 6, 1967. By this decree, the court ordered, *inter alia*, that J. P. Stevens & Company, Inc., its officers, agents, successors and assigns:

Cease and desist from:

(a) Discharging, forcing the termination of, refusing overtime work to, or otherwise discriminating against employees in regard to hire or tenure of employment or any term or condition of employment in order to discourage membership in Textile Workers Union of America, AFL–CIO ["Union"], or any other labor organization.

(b) Discharging or otherwise discriminating against employees for giving testimony under the National Labors Relations Act, hereinafter called the Act.

(c) Engaging in surveillance of employees' activity in respect to union organization or giving the impression thereof.

(d) Interrogating any employee concerning such union activity by him or other employees in a manner constituting a violation of Section 8(a) (1) of the Act.

(e) Threatening its employees with discharge or other reprisals if they become or remain members of the Union or give any assistance or support to it.

(f) Altering its working conditions for the purpose of defeating the organizational efforts of its employees or of Textile Workers Union of America, AFL–CIO, or the efforts of any other labor organization of its employees.

(g) Encouraging or permitting employees to engage in anti-union activity while prohibiting employees from engaging in activity on behalf of the Union.

(h) Intimidating, coercing, encouraging, and assisting employees in withdrawing from the Union.

(i) Instructing employees to watch for and report to the Respondent the union activities of other employees.

(j) Requiring its employees to remove and prohibiting its employees from wearing union insignia.

(k) In any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form, join, or assist Textile Workers Union of America, AFL–CIO, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or mutual aid or protection, and to refrain from any or all such activities.

4. The decree in Nos. 31,245 and 31,164 has been in full force and effect since its entry on March 26, 1968, and at all times herein the Company and the other named respondents had notice and knowledge of its terms.

## B. *Industrial Plant, Rock Hill, South Carolina*

5. The Union's organizing campaign at the Company's Industrial plant in Rock Hill began in the winter of 1967. Shortly after Christmas 1967, two employees, Gerald Rodgers and Bobby Thompson, were talking together in the smoking booth. The conversation was interrupted by the Company's personnel manager, Max Bowers, who summoned Rodgers to overseer Charles Ford's office. Bowers asked Rodgers if he had "heard Bobby talking about the union." Rodgers responded that he had not. Bowers commented that two or three employees had come to his office and told him that Thompson had tried to sign them up for the Union, and Bowers inquired whether Thompson had ever tried to sign Rodgers up as well; Rodgers told him no. Bowers then asked Rodgers "if [he] heard Bobby talking about the union . . . would [he] come out and tell him"; Rodgers replied that he "couldn't tell him nothing that Bobby said . . . ." Bowers told Rodgers that if he "would volunteer some information that they could get [Thompson's] kind weeded out before he caused any damage to the company." Rodgers then left the office, saw Thompson, and told him "that he'd bet-ter watch it, they was after him; that they was asking me had he been talking about the union." We find that in this conversation Bowers interrogated Rodgers regarding the Union activities of employee Thompson, solicited Rodgers to report anything he heard about Thompson's Union activities, and threatened to discharge Union advocates.

6. On February 9, 1968, Rodgers went to Bowers' office to change his income tax forms. Bowers asked him if he had "heard anybody talking about the union." Rodgers replied that he had not, whereupon Bowers turned to R. L. Hale, the superintendent at the Industrial mill who was also present in the office, and declared: "I wish he could be like his mama and come in and tell us about the ones talking about the union." We find that Bowers thus interrogated Rodgers concerning the Union activities of other employees and solicited him to report on those activities.

7. Bobby Thompson was employed by the Company on September 6, 1967, at first in a temporary job. After two months Thompson began work in the tie-in room where his duties included "changing warps for the ladies, picking up scrap iron in the weave room, and carrying out trash, and going down to the slash room, picking up beams, carrying slashing down there, and driving a mule train [a battery operated truck] to haul these things on." On December 19, 1967, Thompson was instructed by John Garrison, his supervisor, to bring the mule train, which had broken down the day before, to the shop to have it fixed. When Thompson arrived at work the next morning, he went to the shop to pick up the mule train; as he was doing so, the mule train failed to cut off and broke his foot. Subsequent to this accident, Thompson, whose foot was in a cast, was told by Bowers that if he merely reported for work the Company would not have a lost-time accident and would pay him his full wages. Accordingly, for the next two weeks Thompson "didn't do anything but just sit around" either in the lunchroom, water house or

smoking booth. After that Charles Ford, Thompson's general overseer, gave him light tasks to perform, and on February 7, he returned to his regular job.

8. Prior to his employment with Stevens, Thompson had been president of a union local at Goldtex Fabrics, another textile plant in Rock Hill. Consequently, shortly after beginning work with the Company he helped the Union's organizing efforts at the Industrial plant by distributing authorization cards and talking to employees about the Union; when he suffered his accident and was required to sit in the lunchroom for two weeks, Thompson engaged a number of employees in conversation about the Union and also wrote "T.W.A., Textile Workers of America" on his cast. We find that the Company was aware of Thompson's organizing activities and sympathies for the Union.

9. On about December 29, 1967, Gerald Rodgers and Thompson were engaged in the conversation referred to earlier when Bowers called Rodgers into Ford's office (see Finding No. 5). About twenty minutes later Thompson, wearing his cast with the Union reference emblazoned on it, was also called by Bowers into the office. Bowers asked Thompson whether he had anything to tell him, and when Thompson replied that he did not Bowers declared that there was a rumor that Thompson was trying to sign up employees for the Union. Bowers then went on to say that he "wasn't going to have that down here in the plant; that he had to run off a man for the same thing when he worked at the Aragon [plant]. . . . [A]nd when the union had seen that they couldn't get in, that the man had come back and begged for his job back, and that he had hired him back, and he had made a fine fellow." Bowers asked Thompson if he had been president of the union local at Goldtex; Thompson replied he had been, and Bowers then stated that he had hired Thompson "in good faith" not knowing anything about his background. Thompson asked Bowers if he had anything else to say, and

Bowers said "no, if he heard nothing further from that, he wouldn't carry it any further." We find that Bowers interrogated Thompson concerning his Union activities, threatened Thompson with reprisals for engaging in such activities and encouraged Thompson to withdraw from the Union.

10. On about February 7, 1968, the day Thompson returned to his regular duties following his accident, weave room overseer Charles Ford summoned him to his office and told him that he had been "written-up" because he was out of his department at the time of his injury; the "write-up" stated that if he were caught out of his department again, further disciplinary action would be taken. We find that Ford issued the written reprimand to Thompson because of Thompson's Union activities.

11. On about February 10, 1968, Thompson went to Ford complaining of a toothache and requested permission to be let off to go to the dentist. Ford refused to allow Thompson to leave work, and then asked Thompson why he wanted "to go around signing up people . . . for the union when [he knew] they don't want it in there." When Thompson requested a witness to the conversation, Ford stated that it did not concern anyone but the two of them. Ford "went on to say that the union didn't do anything for you but make alcoholics out of you. They call you out on strike, make you starve to death, and they don't give you any raise, that the Company gives it to you when they want you to have it." Thompson inquired whether that was all, and Ford said he had something else to discuss with him, that Thompson was "not running [his] job" to suit him. Thompson stated he was doing the best he could, but Ford replied he had "no alternative but to let [him] go." Thompson said that whenever he got his money and termination slip he would know he was fired, and returned to his job. About fifteen minutes later Ford got Thompson and took him to Bowers' office. Bowers proceeded to write down what Thompson and

Ford had spoken about, but refused to record any of the conversation pertaining to the Union. Bowers refused to give Thompson his final pay because it was a Saturday; Thompson left the office but in a few minutes confronted Ford and Bowers again, asserting that since he did not get his money he was not fired and so was returning to his job. Ford said "Well, we didn't fire you; you quit." Thompson repeated that he was going back to his job. He returned to work briefly but Bowers soon approached him and asked him to come to the back door where two policemen, who had been called by Bowers, were waiting; Bowers advised the officers that Thompson had been terminated and if he returned to the premises he would be charged with trespassing. Thompson then quietly left the plant. We find that overseer Ford interrogated Thompson, warned him of the futility of his activities for the Union, and discharged him from the Company because of his Union activities.

12. William Nivens began work at Stevens' Industrial plant in 1950; at the time of his discharge on March 27, 1968, he was the sole second shift maintenance man, and had been for the past seven years; his work took him into every department in the mill. Prior to his dismissal, Nivens had received only one "write-up", in December 1967, but had also received several commendations on his job attendance and performance.

13. Nivens became active in the Union campaign to represent the Stevens' employees in March 1968. We find from the evidence in the record that the Company knew of Nivens' Union adherence and activities.

14. Nivens attended two Union meetings held on March 10 and 17, 1968. On March 14, four days after Nivens had attended his first Union meeting, Eddie Robinette, the plant engineer and Nivens' superior, called Nivens into his office. Robinette declared that he had been getting "too many complaints" about Nivens, that Nivens was "talking too much" and "low rating" him, Wel-

born (Nivens' supervisor), and the machine shop. Nivens asked how long this was going on, and Robinette replied, "It's been going on all the time." Nivens then asked why the matter had not been brought up before and "who was telling him that," but Robinette refused to mention any names. Nivens asked whether Robinette was satisfied with him; Robinette stated he was "satisfied with [Nivens'] work but [he couldn't] have that talking." Neither Robinette nor any other supervisor had ever commented on Nivens' talking to other employees before; indeed, the practice in the plant was that the employees were free to talk to anybody they wanted to. We find that Robinette reprimanded Nivens because of his Union activities.

15. A. On Friday, March 22, 1968, Nivens, after he arrived at the mill, picked up his work card which listed the jobs he was to perform on that shift: "fix pully on burling frame # 15"; "change motor on loom # 282"; "check wires on loom # 256 and power on stop motion." Nivens proceeded to perform the first two jobs indicated, but before he could get to loom # 256, he learned that a sanforizer had stopped operating and would burn the blanket on it if not fixed immediately. Nivens marked the time on his work card that he was starting to repair the sanforizer, left the card in the machine shop, went to the cloth room and fixed the machine. When Nivens returned to the machine shop, he saw plant engineer Robinette and shop foreman Herbert Welborn looking at his card. Robinette said "I see you've got a blank place on your card," and Nivens explained that he "had a sanforizer standing and the man was afraid the blanket would burn, and I went and started it." Robinette said he wanted to see Nivens in his office and there, in the presence of Welborn, told him: "Andy, you've been warned before that these loom motors have priority" and "My boss has been on me about these looms standing. If you're not going to run your job right, I'd rather you'd go back home." Nivens asked

whether that meant for him to take his tools, and Robinette replied that it did.

B. Contrary to what Robinette said to him at the time of his discharge, Nivens had never before been advised that one or two inoperative looms had priority over other pieces of machinery, particularly the burling frame and sanforizer. In fact, Robinette had told Nivens the precise opposite. Indeed, there were 737 looms in the plant but only 16 or 17 frames and just four sanforizers; and clearly Nivens had reason to believe production would be more affected by the breakdown of either a frame or a sanforizer than of a loom, and the former had always been given greater priority.

C. We find that the Company terminated Nivens because of his Union activities.

### C. *Longview Plant No. 1, Hickory, North Carolina*

16. The Union organizing campaign at Longview Plant No. 1 began in February 1969. About March 10, 1969, the Company required all its employees at the plant to attend a meeting concerning the Union, where they were addressed by Robert Froeber, president of Stevens Hosiery Division. Froeber stated in part:

> People sometimes sign cards for the union without realizing what may be the legal consequences.
>
> One thing the union organizers always say is that if you sign the union card, then nobody except the union and the Labor Board will ever see the card which you sign. You should realize and understand that this statement by the union may turn out to be completely false.
>
> Unions often try to get themselves legally certified on the basis of the signed cards—without employees being given any opportunity to vote on the matter at all—and sometimes regardless of how the employees have voted. When that happens the cards that have been signed definitely do have to be brought out and laid on the table and shown in an open public hearing.
>
> Then the assurances of the union organizers turn out to be totally untrue and misleading.
>
> This is exactly what happened in a Stevens plant down in Statesboro, Georgia. There the employees voted the union down decisively. Despite that, the union—this same Textile Workers AFL–CIO union—started a legal proceeding in which all the people who had signed cards were subpoenaed and forced to go to the witness stand in a public hearing at the courthouse, to prove that they had signed the union cards.
>
> What you think of that, of course, is for you to decide—but that is precisely what this same union did to those employees—after having assured them that their signed cards would always be kept private and confidential!

Beginning about a week later, the Company posted notices containing the excerpted portion of Froeber's speech on plant bulletin boards. We find that the Company's warning that it could learn which employees signed Union authorization cards constituted a threat in the circumstances of this case, as more fully set forth below.

17. At about the time Froeber spoke to the employees, he also met with the Company's supervisors telling them that Longview Plant No. 1 was the newest plant in the Stevens organization, that the Union was moving in fast, and that he would not permit this plant to be the first one organized. He then stated that it was up to the department heads to work closely with the people to try to defeat the Union, that the supervisors' relations with the employees would be the main thing that would determine whether or not the employees wanted a union, and that "most of the responsibility lay upon the supervisors" for the Union "getting the firm foothold that [it] had. . . ." Then, although Froeber told the supervisors not to threaten or interrogate employees concerning their Union

activities, he also stated that Union advocates had to be stopped and could be discharged, so long as their association with the Union was not the excuse for firing them. Shortly after Froeber spoke, William Thor, the plant manager, held a separate meeting with the supervisors where he took up the same themes as Froeber had. He opened his remarks by commenting that they knew "why we are here" and went on to say that if the Union were successful, they would "have people like the Jones boys and Gladys Whitener [pro-union employees] telling us what to do." Thor declared, "We've got to get rid of these kind of people regardless of what it takes, no matter what it takes to get rid of them, and any others to keep the union out of this mill, out of this plant." He concluded by saying that if the supervisors "heard anything else to report it" to him or personnel manager Glen Deck, since the Company "had an attorney especially hired to advise them in union affairs and he would call this attorney."

18. Gladys Whitener worked for Stevens from September 1965 until her discharge on March 27, 1969. At all relevant times she worked as a first shift quality checker at the Company's Longview Plant No. 1. Whitener's duties required her to circulate among the some 91 employees in the auto-boarding, pre-boarding and dye-boarding sections of the boarding department in order to check and report on the quality of hosiery they manufactured. Although Whitener received a personnel action report during her tenure at Stevens, her work was generally satisfactory and she had been steadily promoted.

19. Whitener was one of the staunchest advocates of the Union when its organizing campaign began at Longview Plant No. 1 in February 1969. She attended every meeting the Union called and while on the job vigorously promoted the Union to the various employees with whom she came in contact; indeed, some employees regarded her as the union leader. Whitener also expressed her pro-Union sympathies directly to management, e. g., to Harold Abee, her immediate superior, and we find that the Company knew of them.

20. A. Harold Abee's treatment of Whitener changed following her initial conversation with him concerning the Union. Abee "followed [Whitener] everywhere [she] went, even early in the mornings when [she] would check the hands of the operators. He walked up one aisle and watched [her] while [she] checked the other aisle; and when [she] changed aisles, he changed and watched [her] from behind the machines. Everywhere [she] went, he was right behind [her] like a shadow." Abee had never acted in this manner before, indeed, Whitener "had a hard time finding him when [she] needed him up until then."

B. After Froeber's speech on March 10, 1969 (see Finding 16), Abee made a change in Whitener's job designed to limit her contact with her fellow employees. Prior to this time Whitener would wheel in a mobile table among the employees in the boarding department while they worked; Whitener would then inspect an operator's work at the latter's table, where she would fill out her quality reports. But Abee now required Whitener "to not check the work on [the operators'] tables anymore, to check all the work on [her] table, to bring it back to [her] table" even though this was a slower procedure and especially made it difficult for Whitener to point out to the employees where their work was faulty.

C. At the same time that he made the work change described above, Abee admonished Whitener over and over again not to talk to the operators, until Whitener was finally discharged. Accordingly, Whitener made herself a small sign which stated "I am not allowed to speak. Harold's [Abee's] orders," and for a short while held it up whenever an operator attempted to engage her in conversation. The other employees were under no similar prohibition: they were allowed to talk on the job, as they always had been, about

whatever they wished, whether related to their work or not. Indeed, the Company up until this time—and again after the Union campaign died out—tolerated all sorts of non-work-related activities on the job, not merely, for example, contributions to charities or donations to a bereaved family, but also commercial solicitations for such things as cosmetic products, candy, and various other items —activities in which even supervisors indulged. Such solicitations were allowed so long as they did not involve the Union.

D. On one occasion, Abee reprimanded Whitener about her using the bathroom too much. Whitener, who had a kidney infection and was taking medication, entered the bathroom with two fellow employees, Sally Pugh and Opal Hawn. When she came out Abee criticized her because she had "been in the bathroom about eight minutes." He later repeated his complaint to finishing superintendent Causby. Whitener asked Abee why he had not also brought in either employee Pugh or Hawn to reprimand them about excessive use of the bathroom, since "he saw them go with me and come back with me." Both Abee and Causby said they would "take care of them later."

E. We find that the Company harassed Gladys Whitener by shadowing her, by orally reprimanding her, by forbidding her to speak to fellow employees and by changing her working conditions, all because of her Union adherence and activities.

21. A. During March 1969, Whitener told Leonard "Red" Duckworth, a research technician who attended some supervisory meetings, that she "was upset because of the pressure Harold [Abee] was putting on [her] about the union." Duckworth invited her to his office where he said, "I know about the pressure . . . . In fact, they have had three Gladys meetings already . . . . Gladys, if you don't stop messing with the union, you are going to get fired." At that point Duckworth's telephone rang, and Whitener invited him to come to her home later. Duckworth arrived at Whitener's trailer that afternoon and stayed for several hours. Duckworth commented that hosiery president Froeber had stated in a supervisors' meeting that "they were going to have to find out who the union leaders were and get rid of them," and that the supervisors did not have to fire the employees for Union activity but could always find another excuse. Duckworth quoted Froeber as also saying that "We're going to have to get rid of Gladys Whitener; she is a leader and all the people are following her. . . . And we'll probably have to pay her, but we would be better off to pay her to stay out of the plant than we would be to pay her to come in."

B. On the morning of March 26, 1969, Harold Abee took Whitener to Causby's office. En route Abee declared that Whitener had "threatened people's quality with the union, if they didn't sign the union card [she] would give them bad quality reports." Whitener told Abee that he knew "better than that," that she "check[ed] the quality fair," but when Abee claimed that he had witnesses, Whitener demanded to see one. Abee told Whitener to wait in Causby's office until he could get the witnesses; after almost three hours, however, he returned empty-handed. Whitener asked him where the witnesses were and Abee replied that he was "still going to check it out further," but that Whitener could go to lunch. When Whitener returned from lunch, Abee would not let her do work normally but placed her behind his desk where he could watch her. The next day, March 27, when Whitener reported to work, Abee intercepted her and told her to come with him to Causby's office, whereupon, notwithstanding her denials, he terminated her for pressuring employees on behalf of the Union.

C. We find that at no time did Gladys Whitener ever change the quality report on any employee's work, or threaten to change the quality report, depending on whether or not the employee

supported the Union. We further find that on March 27, 1969, the Company discharged Gladys Whitener because of her Union adherence and activities.

22. James Jones first went to work at the Company's Longview Plant No. 1 in November 1967 as a line fixer operating and maintaining machines manufacturing stockings. He voluntarily left Stevens in December 1968 but returned the · following January to his previous job on the third shift. When Jones was rehired, he was told by R. C. Coley, then the department head over the knit room, that he was glad to see him back, since he had done a good job before; Coley also told James' brother, Robert, who worked together with James, that James was one of the "best line men there," a compliment that was echoed by Henry Kaylor, the immediate supervisor over the third shift.

23. James Jones participated actively in the Union organizing campaign at Longview Plant No. 1 in the early part of 1969. He passed out Union literature and had employees sign cards designating the Union as their bargaining representative; he once even jokingly offered a card to his immediate supervisor, Henry Kaylor. Jones also attended a Union meeting on March 10, 1969, subsequent to which he went to work at the plant. Prominently displayed in his shirt pockets that night, as was his custom, Jones carried some Union pamphlets and authorization cards. James Jones was the only employee in this department who so openly carried these materials into the plant. We find that the Company was aware of his support of the Union.

24. Soon after reporting to work Jones was stopped by Henry Kaylor; Kaylor pointed to Jones' shirt pocket and declared: "I'd like to talk to you about that." Jones agreed but referring to Robert, who was standing nearby, said, "I'll use my brother as a witness." Kaylor refused to allow this and told Robert Jones to go back to his machine. He then grabbed James by the arm and led him to the supply room, where he

said he did not want to see Jones "soliciting or campaigning for the Union on the job"; James told Kaylor that he had "no intention of doing so." Prior to this conversation, however, it was the practice and custom among the employees in this department to engage in non-work-related activities during working time; such activities included: collection; playing "check-pool," in which supervisors like Kaylor joined; and commercial solicitations, also engaged in by supervisors, and in some cases, even by the wives of supervisors who were not employed at Stevens.

25. During the course of the third shift on March 10, all operations in the plant were shut down and the employees assembled to hear Froeber's speech concerning the Union (see Finding 16). Shortly thereafter, Kaylor accused Jones for the first time of leaving his line of machines too much. Later, after Jones returned from one of his scheduled breaks, Kaylor also criticized him for staying too long on the break. Again, Kaylor had never before reprimanded Jones about overstaying his break; in fact, the employees customarily extended their allotted ten minutes to twelve or fifteen minutes without comment by their supervisor. On this particular occasion, however, Jones had not overstayed his break. He was supposed to take his break at 1:00 a. m., but delayed leaving at the request of his brother, who asked James to watch his machine while he went to the bathroom; when Robert returned at approximately 1:04 a. m., James then left, returning at 1:15 a. m.

26. Normally, five employees operated the hosiery machines, aided by a "float fixer" and the shift supervisor; each employee looked after 60 machines. During the evening of March 10, however, since there was no "float fixer," and one regular employee, Don Herman, was absent from work, the four remaining fixers, together with Kaylor, tended Herman's line of machines from time to time along with their own. It was also the practice that when employees went

on break, the fixer who operated the adjacent line of machines would operate the breaking employee's line as well. As soon as James Jones returned from his 1:00 a. m. break, two of the other four employees at work that night, Robert Jones and Randy Youngblood, went on their scheduled breaks. And, after reprimanding James Jones for allegedly overstaying his break, Kaylor, without letting James know, joined them. James Jones was left tending to his own line of machines, the lines of his brother, of Youngblood, and of the absent employee Herman; James received no assistance from the remaining employee, who was inexperienced and handled his own machines exclusively. It was virtually impossible for James Jones conscientiously to look after the operation of 240 hosiery machines, particularly since the machines were running a new and difficult style of hose. When Kaylor and the others returned from their break, James Jones approached Kaylor and said: "Next time that you go on break, I would appreciate it if you will stop by and tell me and I will at least try and run all the machines." Kaylor became angry and declared, "Insubordination, get your tools and go home." Jones asked "what for," but Kaylor again told him to get his tools and leave, and then asked him to come into the office with him; when Jones refused, Kaylor looked at the clock and stated that it was "1:30, and your time is stopped." At no time during this conversation with Kaylor did James Jones use any offensive, abusive or vulgar language.

27. The next morning, March 11, just after the third shift ended, an informal meeting ensued in the knitting room office concerning James Jones; participating were R. C. Coley, the department head over the machines that Jones operated, Arlie Graves, assistant department head, Bill Thor, plant manager, Milburn Hubbard, the department head over the knit room, and Henry Kaylor. Coley asked Graves whether he had heard about Jones, and Graves replied that he had not. Coley explained that Jones had been sent home the night before and that he had come into the plant with union literature in his shirt pockets; Kaylor said that Jones had asked why he was being sent home and that the reason he, Kaylor, had given him was insubordination. At that point research head Truitt Baird, who had just walked in the door, commented that they "should be more specific, that insubordination did cover a pretty wide territory." When Coley asked Graves what he thought, the latter replied that Coley was "walking a mighty thin line, but the boy does do good work and I think you should keep him." Coley then said no more to Graves, turning the conversation away from him. At the conclusion of the meeting it was decided that "insubordination" was the reason that would be used to discharge Jones; Thor said that he would call the Company's attorney "and check with him to see if this would hold up in court in case Mr. Jones decided to carry his discharge to the court."

28. The same morning that the supervisors met to discuss James Jones' fate, but apparently before the decision was made, James returned to the plant and, with his brother Robert spoke to Milburn Hubbard, the head fixer over all three shifts. James mentioned to Hubbard that he was for the Union and would "try to get it in the plant the best [he] knew how and any way [he] could"; Robert then asked whether James was fired. Hubbard said that it was not for him to decide and told James to come to work that night. When James did, Bill Hicks, the second shift supervisor, stopped him and told him to report to the office, where he confronted Kaylor and Hubbard. Kaylor read from a piece of paper, stating that it had been recommended that Jones' employment be terminated, that the matter had been reviewed by the plant manager, and that the recommendation had been approved. Shortly after James' discharge, Robert Jones asked Kaylor whether James had been fired because of his Union activities; Kaylor

said he would rather not say. We find that the Company discharged James Jones on about March 10, 1969, because of his Union activities.

### D. The Roanoke Rapids Plants, Roanoke Rapids, North Carolina

29. Doris Bowers worked for the Company a total of 14 years. When, following a sick leave, she was rehired in the fabricating department, she was told by personnel manager Leonidas Hux, that "all they say about you [in your record] is something good." Bowers worked as a fringe inspector in the fabricating department for five years until her discharge; she inspected and classified terry cloth towels.

30. A. Bowers was the only employee who associated with Lillian Hux and Shirley Hobbs, fellow employees who had previously been discharged by the Company because of their Union activities and who had been ordered reinstated by this court in our earlier decree.[1] Bowers also attended a Union rally held in Charlotte, North Carolina, on about February 25, 1968. After she attended this rally, the attitude of her supervisors toward her changed. Before, "everyone was quite friendly and would speak when they saw [her] or sometimes even go out of their way to speak; and after that day they seemed to avoid [her] . . . and avoid passing [her] and, if they had to pass [her], would look the other way." Bowers also began having trouble with her service boy, Wayne Edmonds, who was responsible for distributing the towels for inspection and then collecting them. Edmonds began bringing Bowers all the towels that were more difficult to inspect. These towels were supposed to be divided equally among all the inspectors before doing the preferred towels; instead, the other two inspectors on Bowers' shift, Peggy Rhome and Kay Bailey, would point to the buggies of towels they wanted to inspect, although this was against Company policy, and Ed-

monds would oblige them. Bowers complained at first to Edmonds about this unfair treatment. When he refused to answer she went to her floorlady, Edna Parrish, who had once told a group of employees, including Bowers, that the Company knew everyone who was for the Union. Parrish promised she would talk to Edmonds; but in reality she was unsympathetic and passed off Bowers' complaints as a joke. Before Bowers became involved with the Union, a service boy would be reprimanded if she complained about his performance. Because Bowers now received the more difficult work to inspect, she found it increasingly difficult to keep up her production.

B. On or about March 12, 1968, Bowers began wearing a Union button on the job; only the reinstated employees wore such buttons in this department. As soon as she took her coat off at the beginning of her shift, Marshall Cox, the department supervisor, noticed the button, got floorlady Parrish and went into the office of Mason Lee, the general superintendent of the department; in a few seconds, Lee, Cox, Parrish and general overseer Robert "Pete" Rawlings emerged and began staring at Bowers. For the rest of the day, whenever Bowers would look up, even on her lunch break, there would be another supervisor staring at her.

C. On March 13, 1968, each inspector was working on a buggy of dyed yarn towels, which were the harder towels to inspect; there was another partial buggy of dyed yarn towels waiting to be inspected. Both Rhome and Bailey finished their buggies before Bowers, and under the normal procedure one or the other should have turned to the partial buggy of dyed yarn before doing the fringe blanks, which were easier to inspect. Edmonds, however, brought them both buggies of fringe blanks to work on and then, after Bowers finished her buggy of dyed yarn towels, brought her

---

1. See J. P. Stevens & Co., 157 NLRB 869, 944–46, 951 (1966), enf'd, 380 F.2d 292 (2d Cir.), cert. denied, 389 U.S. 1005 88 S.Ct. 564, 19 L.Ed.2d 600 (1967).

the remaining partial buggy. Bowers asked him whether Edna Parrish told him to bring her those towels. Edmonds checked with Parrish, returned and said that Parrish had instructed him to bring Bowers those towels. Bowers said that she would make a note of it, and Edmonds replied that he did not care what she did, that she could make all the notes she wanted; Bowers told Edmonds not to "talk ugly" to her or she would note that too, whereupon Edmonds replied that supervisor Tommy Gardner had told him not to let her "talk back" to him. Later that day Edna Parrish called Bowers into the office where she was confronted by Tommy Gardner and Marshall Cox. Gardner told her that he had cautioned her before about arguing with the service boy, that she "couldn't get along with any service boy" and that she should "go back out there and do the work that's assigned," because if he had to bring her back in the office again, he would discharge her. During this conversation Gardner also showed her several towels that he asserted she had classified and said he "couldn't keep overlooking that sort of thing"; Bowers could see nothing wrong with the towels. Gardner, who had never had to write Bowers up before, gave her a reprimand, which he had prepared even before he spoke to her.

D. Following this conversation, Bowers often would have to service herself, pulling up the heavy buggies of towels to her table and pushing them away when she was through, because Edmonds would not assist her when she called him. If Bowers insisted that Edmonds help her, he would bring towels to the other inspectors before he brought hers. Meanwhile, Edna Parrish would stand back "and watch [Bowers] stay out of towels and [made] no move" to call Edmonds herself.

E. We find that the Company was aware of Doris Bowers' adherence to the Union and because of that adherence discriminated against her with respect to work assignments, engaged in a campaign of harassment against her and threatened her with discharge.

31. On the morning of March 19, 1968, Doris Bowers received two buggies of Sears Roebuck fine arts towels to inspect; these towels were the most difficult to examine and normally one of the other inspectors should have gotten at least one of these buggies. As Bowers struggled to take the towels, which were very heavy, out of the buggy and onto her table, Tommy Gardner walked up to Peggy Rhome, one of the other inspectors, who was working on light weight, easy to handle towels, and "helped her get towels off her buggy and put them on her table"; Gardner in the past had never assisted any inspector in this manner. After she finished examining the Sears towels, Bowers noticed that there was no attempt to sew in the label on her work. Instead, one of the reinspectors, Betty Mosely, came over to the completed buggy of towels and took a number of them away; as a rule, however, reinspectors did not reexamine towels after a buggy had been finished. Mosely, another reinspector, Ruby Davis, Marshall Cox, Edna Parrish, Wayne Edmonds and Tommy Gardner then proceeded to examine the towels. Shortly thereafter Parrish brought Bowers into the office to meet with Cox and Gardner. Gardner had a stack of towels on his desk, which he said Bowers had examined, but he showed her only two of them containing minor defects. He declared he had warned her before, on the occasion of her earlier write-up, that he could not "overlook this thing" and that he had "no choice but to discharge" her. We find that the Company fired Doris Bowers on March 19, 1968, because of her Union adherence and activities.

32. Shirley Hobbs had been unlawfully discharged by the Company previously because of her participation in union organizing activities; she was ordered reinstated by this Court's decree and returned to work at the fabricating department, where her job was folding

and inspecting napkins.[2] Hobbs continued her Union activities: after her shift she distributed Union leaflets and, together with Doris Bowers and two other reinstatees, Lillian and Rochelle Hux, wore a Union button on the job. We find that the Company knew of the continued pro-Union sympathies of Shirley Hobbs.

33. On about March 13, 1968, Hobbs reported to work feeling ill. At 9:00 o'clock that morning she decided to leave, advising Ray Mabry, her service boy, that she wasn't going to fold any more napkins. Hobbs got her coat and pocketbook, whereupon fellow employee Lillian Hux asked her where she was going; Hobbs explained that she was sick and going home. Hobbs then looked for floorlady Janet Evans, who was standing in the aisle near the shipping department talking to another employee, Dale Gossett, and told her also that she was sick and going home. Evans said "okay." After leaving the plant, Hobbs decided to see a doctor, and went to the Union hall to borrow ten dollars for the fee from Virginia Kiser, an organizer; while there, Hobbs noticed that she had been followed by James Alston, a Company supervisor who went by in his car. Hobbs then left the hall and, too ill to drive herself, was chauffered to her doctor by Bob Carsey, another organizer. As soon as Hobbs had been examined by the doctor, she called the plant and advised "Pete" Rawlings that the doctor had written a certificate attesting to the fact he had seen her that day and had told her not to return to work until the following week. Rawlings told her not to bother, that she no longer had a job "to come back to" since she had walked off without receiving permission from Evans; Rawlings said she could see Mason Lee about the matter, but it "wouldn't do any good." Hobbs returned to the plant the next day and met with Rawlings and Lee; the latter stated that she had broken a Company rule by walking off the job without permission. Hobbs explained that she did not walk off the job, that Evans had given her permission to leave, and that she had been sick and had gone to see the doctor; she then showed the doctor's certificate, but Lee replied that it "didn't mean anything to him." We find that the Company discharged Hobbs on March 13, 1968, because of her support of the Union.

34. A. In March 1968, Thaddeus Browder was an assistant overseer in the carding room at the Rosemary Plant No. 2. One of the employees who worked for Browder was a sweeper, Joe Nicholson. Browder, impressed by Nicholson's excellent job performance, decided to write up a commendation that would go into his personnel file and broached the idea to his immediate supervisor, general overseer Franklin Babson, who agreed with Browder's plan. Browder also told Nicholson that he was going to receive an award and, accordingly, to wear a clean shirt. Several days after Browder spoke to Babson about the matter, Babson came into work early and told Browder that if the Company gave Nicholson an award, "they more than likely would have to give them to everybody"; Browder responded that that was a good idea "if everybody deserves them." Then Babson advised Browder that "there was information that Joe had said that he had two brothers working in the shipyard that were members of the union and he did not know how he would vote if a vote was held; and that because of this . . . he felt like [they] shouldn't give Joe his commendation at this time; maybe at a later time, they could give it to him." Nicholson, who had faithfully brought a clean shirt to the plant with him for a week or so, never heard any more about his award.

B. The following July 1968, Babson told Browder to evaluate all the men

2. See J. P. Stevens & Co., 157 NLRB 869, 951 (1966), enf'd, 380 F.2d 292 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967).

working for him as to their job performance. Browder rated Nicholson "excellent." Babson reviewed Browder's recommendations and declared that because of the "information on Joe he thought we should rate Joe poor and not excellent." Browder insisted that Nicholson should be "rated at least good," and this was then agreed upon.

C. We find that the Company denied Nicholson a favorable personnel action report, and down graded his work evaluation, because of its belief that Nicholson favored the Union.

35. Until 1968, Browder often had occasion to go through file cabinets and drawers in the desks in order to find various forms or records. He frequently noted "a listing of everybody for several years," which had, next to each name, an "F", "A" or "U." One night at work, Browder received a note from James Butler, the second shift overseer, that originated with Babson: that note required Browder "to grade every man as best [he] could whether [he] thought he was for the union, against the union, or whether it was unknown." Browder submitted two such lists to Babson approximately three months apart. We find that the Company required and maintained quarterly reports on the employees' Union activities.

E. *Gulistan Plant, Aberdeen, North Carolina*

36. James Biby began work at the Gulistan plant about November 1964, as a forklift driver; shortly thereafter, he became a general mechanic in the Company's maintenance shop, a position which the Company helped foster at first by allowing Biby time off to attend a mechanics training school. Biby's duties encompassed the servicing and repair of virtually all the Company's machinery, and more than any other employee on his shift, he worked throughout the plant, as well as in the shop. Biby performed his job well.

37. Biby was an active participant in the Union organizing campaign that commenced at the Gulistan plant in about February-March 1968: he attended Union meetings and spoke to employees about the Union at their homes and in the plant, during his break and lunch times; he succeeded in soliciting signed Union authorization cards from some forty fellow workers. On one occasion, on about March 16, 1968, while Biby was lunching with a group of employees in the machine shop he handed out notices of a Union meeting, when Wade Reynolds, a weave room supervisor, came in to work on a bird house. One of the employees kidded Biby, suggesting that he give Reynolds a copy of the notice. Biby asked the supervisor whether he wanted one, telling him "he would make us a good man"; Reynolds ignored the request. We find that the Company had knowledge of Biby's Union adherence and activities.

38. A. On March 14, 1968, Biby was welding a boiler near the preparation department. When he took his break at a nearby concession area, he was asked by Larry Cole, a beaming machine operator, to check the level of oil in his machine; Ernest Owens, Cole's supervisor, stood nearby during the conversation. Biby checked the oil in Cole's beamer, found it low and filled it up. Biby then returned to his welding job, and shortly thereafter his supervisor, Barney Kirk, came over to him and said that Owens had complained about Biby's "bothering his help." Kirk informed him that from then on, Biby "was not to do anything to anybody's machine or fix anything without a work order or a special order from him," instructions which Owens also repeated to him. Up until this time, however, the practice in the plant had always been that an employee in any department could ask a passing mechanic, or go directly to the maintenance shop to get a mechanic, to assist with routine servicing and repair jobs, without first obtaining a work order.

B. On about March 18, 1968, plant manager Cecil Beith addressed all the Gulistan employees concerning the Union. The next day, Biby was working in the boiler room, and when it came time

for his break he went to a concession area near the finishing department. Although there was a break area nearer to where Biby was working, the vending machines there were often out of order; but in any event, the Company permitted employees to take their break in virtually any location within reasonable distance of where they were working. However, on this occasion, Barney Kirk came up to Biby and declared that he was "at it again," that he was supposed to take his break in the shop; Biby explained that in the four years he had been there, he always took his break "wherever [he] was working at or the nearest place to it." Kirk responded that from now on Biby had to go back to the shop to take a break, even though, as Biby told him, a ten-minute break did not even allow him enough time to walk to the shop and back from some parts of the plant. Kirk also raised another matter, that Biby was "always talking to somebody in the shop or wherever you're at." Kirk stated that Biby had been talking loudly to two employees the previous day, and that when Kirk asked a bystander what was going on, he was told "That was Biby talking Union meeting." Biby explained that Kirk had been misinformed, that the conversation had concerned Biby's motorcycle, which he wanted to sell. Kirk said that he just "wanted that talking stopped" since "there was too much of it." Up until this time, however, talking about a variety of topics—such as politics, integration, racing and ball games—was commonplace in the shop, and no supervisor had ever commented on it.

C. We find that by the conduct described above the Company altered Biby's working conditions, and discriminatorily restricted his movements because of his Union activities.

39. After his regular shift, on about March 18, 1968, Biby returned to the plant to use the machine shop's equipment for some personal work. The leadman on the shift, George Vanhoy, assisted Biby, working with one lathe while Biby used another. A few days later,

Kirk called Biby into the office and explained that he was being discharged for using the shop for personal work without having obtained permission. In fact, Company employees and supervisors frequently used the machine shop, both during their shifts and afterwards, for a variety of purposes, which included their own work and the work of others. Prior permission was unnecessary. We find that the Company discharged Biby on or about March 20, 1968 because of his Union activities.

40. Larry Cole and Robert Swanson Mabe ran beamer machines at the Gulistan plant when the Union campaign began in March 1968. Both employees were active in that campaign: they attended meetings, talked to employees regarding the Union at the plant and on the parking lot, during their breaks, and tried to get them to sign authorization cards designating the Union as their bargaining representative. Cole, too, after the campaign began led a group of employees to their supervisor, Ernest Owens, and asked for more money; on that occasion Owens inquired whether they had "anything to do with the Union." We find that the Company was aware of the pro-Union sympathies of Cole and Mabe.

41. After Cole and Mabe became involved in the Union, their supervisor Ernest Owens continuously watched them and followed them to the bathroom, writing down in a notebook the times they entered and left. Furthermore, before the Union campaign started the employees would take, at times, up to 30 minutes for a break and up to an hour for lunch and no supervisor would object; indeed Owens often would join them. But now Owens criticized these practices: on March 22 and May 1, 1968, he wrote up Larry Cole for exceeding his lunch and break allowances; on the latter date he also issued a written reprimand to employee Mabe for the same alleged misdeed. Owens changed other working conditions as well: He checked the work of Cole and Mabe particularly closely, notwithstanding the

years they had been there; he allowed the employees to smoke only on their breaks, instead of permitting them to occasionally light a cigarette between breaks; and he required them to go through him to get a maintenance man to work on their machines, rather than calling a man themselves. Finally, Owens moved Cole, despite his objections, to a beamer that was more difficult to operate than the one he was used to; Cole had so disliked this machine that he previously had refused an opportunity to transfer to a more favorable shift because it would have meant operating it. After the Union campaign ended, nondiscriminatory conditions in Cole's department were restored. We find that the Company changed its existing work practices because of the Union campaign, particularly with respect to employees Cole and Robert Swanson Mabe, and issued written reprimands to them because they engaged in protected Union activities.

42. A. Bobby Ray Mabe worked as a first shift carpet sample cutter at the Gulistan plant from February 1966 to July 1968; his supervisor was Billy Whittle. Bobby Mabe was active in the Union campaign commencing in March 1968; he attended meetings, he was a member of the Union's organizing committee, and he spoke to employees, at their homes and at the plant, during his breaks, in an attempt to have them sign authorization cards. We find that the Company was aware of the pro-Union sympathies of Bobby Ray Mabe.

B. On about March 9, 1968, Bobby Mabe was distributing Union cards to various employees prior to the start of his shift. After beginning work for the day, supervisor Whittle called Mabe, who had some of the cards sticking out of his shirt pocket, to his office, where he announced "a new Company policy" to him —that Mabe was not to leave his department without getting permission, that he was to go directly to the bathroom and back without speaking to anyone, and that when he punched out, he was to go home immediately. Previously, em-

ployees could take their breaks as they wished and no supervisor had ever objected. Whittle told Mabe that his instructions to Mabe applied to all the employees in the department, but by the time Mabe left the Company in July 1968, several employees had not yet been informed by Whittle of the new "regulations."

C. On about March 14, 1968, Whittle advised Mabe of another rule, that he could not leave his carpet cutting machine while it was in operation; when Mabe protested, Whittle amended the rule to require Mabe to stay within an area marked off around the machine. Mabe's previous practice had been to leave the machine while it was running to go anywhere in the area necessary to obtain carpet to be cut into samples.

D. On about April 1, 1968, Mabe put a pro-Union sticker on his car. Whittle thereafter required Mabe to note on his time card whenever he left for and returned from a break; so far as Mabe knew, this requirement was not applicable to any other employee in the department. Whittle also restricted the time Mabe could take for his work and lunch breaks; before the Union campaign started, however, his supervisor had never raised this matter with Mabe.

E. We find that the Company changed Bobby Mabe's working conditions in order to discriminatorily restrict his contacts with his fellow employees because of his involvement with the Union.

F. *Carter Plant, Wallace, North Carolina*

43. Charles Epley worked for Stevens at its Carter plant at Wallace, North Carolina, from December 11, 1965 until his discharge on February 14, 1968. At all relevant times, Epley operated a framing machine, a massive piece of equipment that processed cloth after it had been dyed. Epley became involved in the Union campaign that began at the Carter plant in June 1967, when he joined with the Union organizer in going to the homes of various em-

ployees to solicit their signatures on authorization cards. Epley also went to Union meetings, and on August 2, 1967, attended a meeting at the home of a fellow employee, Joe Scronce. As the employees left the meeting they noticed two Company supervisors from the framing department, Robert Quinn and Davis Chestnutt, in a car slowly circling the block on which Scronce lived. About a month later the Union telegraphed the Company, notifying it that Epley was a member of the Union's organizing committee; the Company posted on bulletin boards throughout the plant copies of both the telegram and its response, indicating that Epley's Union "membership or activity" would not give him "any immunity of any sort, nor any preference over other employees." The name of no other employee in Epley's department was displayed in this manner. We find that the Company had knowledge of Epley's Union activities since the time he attended the Union meeting on August 2, 1967, and certainly after it received the Union's telegram.

44. Until Epley became involved with the Union he had never received any reprimand from the Company. Thereafter, however, the Company began a campaign of harassment directed against him and began criticizing him for mistakes that had always been tolerated in other employees. On August 4, 1967, Epley received a write-up for supposedly standing on a guard rail near his machine. On about August 25, 1967, supervisor Goodrich asked Epley where his scissors case was, and Epley explained that he never used one; Goodrich ordered him to get a case, which Epley did. The next day, however, Epley resumed his usual practice of not using a case, and when Goodrich saw him again, he and supervisor Smith issued a written reprimand to him. Frame operators used scissors cases or not, as they pleased, and no other operator but Epley was criticized for not having one. On or about September 8, 1967, Epley received another write-up, this time for running the cloth in his machine

through an improper finish, which resulted in its being discolored. This sort of error, however, was commonplace and such cloth was merely run through the machine a second time, using the proper finish, or if the discoloration was too great, the cloth was simply re-dyed a different color and sold accordingly. Other than Epley, no operator had a written report of it placed in his file. On October 30, 1967, Smith issued another reprimand to Epley because he had been observed pushing the "reset" button on the generator of his frame after it had kicked out due to an overload. Although the employees had been warned not to reset the generator themselves but to call an electrician to do it, no employee other than Epley had ever before been written up for doing so. On November 28, 1967, Epley was again reprimanded for running cloth with the wrong tolerances. Like the other incidents, however, such a mistake was common, and no one other than Epley had been written up about it before. We find that the Company harassed and criticized Epley and changed the enforcement of work rules with respect to him, as described above, because of his Union activities.

45. On about February 12, 1968, Epley was attaching a beam of cloth onto the frame, a difficult process, particularly on Epley's frame, which was the oldest in the department. While Epley was attaching the beam, the beam fell off the de-beamer and one end of it landed on the floor; the only damages resulting was one small dirt spot on the cloth. Supervisor Goodrich came up and told Epley to put the beam back on the frame and run it. The next afternoon, however, Supervisor Smith called Epley into the office, instructed him to leave work and to return the following day; when Epley did so, Smith told him he was fired "on account of what had happened." Although Epley's termination sheet indicates that the reason for the discharge was because he allowed the beam to fall on the floor, in fact it was a common occurrence, especially on

**1346**

Epley's frame, for a beam of cloth to be thrown off the machine. No employee had ever been reprimanded for this before; rather, when it happened he was merely told by his supervisor to put the beam back on the frame and continue to run it. We find that the Company discharged Epley on February 14, 1968 because of his Union activities.

46. Harry Nelson Hunter was employed by Stevens from July 1960 to July 1966, and then from November 1966 until he quit on September 30, 1967; at all relevant times herein Hunter worked as a rechecker in the tubing department, responsible for examining cloth prior to its being sent to the customer. Hunter participated in the Union campaign that began at the Carter plant in June 1967: he spoke to employees both at the plant during break times, and at their homes, signing them up for the Union; and he attended all the Union's meetings, including the one at Joe Scronce's home (see Finding 43). On about August 21, 1967, the Union sent a telegram to the Company, advising it that Hunter was a member of its organizing committee; as in Epley's case, the Company posted the telegram and its response on the bulletin boards around the plant. Hunter was the only employee in the tubing department whose Union association was thus displayed.

47. A. Hunter had never received a reprimand during all the time he worked as a rechecker, until he became involved in the Union. Then on about September 2, 1967, Hunter learned that cloth he had inspected was being pulled back from packing and rechecked, something that previously was never done. Hunter was shown three pieces: one piece was supposedly dyed unevenly, but Hunter's supervisors admitted there was nothing wrong with it; a second piece had some pinholes in it; and the third contained some grease spots about the size of a cigarette end. Although Hunter complained that the lighting at the table where he checked the cloth containing the pinholes were inadequate to reveal

that kind of defect, he nonetheless received a written reprimand. Thereafter, the lighting at that particular table was improved by the Company. Moreover, Hunter, like all the recheckers, had previously been given wide latitude in permitting cloth that contained minor defects, like these pieces, to go on to the customer.

B. On about September 16, 1967, more of Hunter's cloth was pulled back from packing, and the Company complained that two pieces contained defects; Hunter insisted that one of the pieces was still first quality, and the other piece, containing a grease spot, could have been treated and still sent out. Hunter received a write-up for this incident, too, which he refused to sign.

C. Shortly after receiving the September 16, 1967 reprimand, Hunter made arrangements to find another job. On about September 30, he quit the Company, explaining to supervisor Jones that he was leaving for "more money, less pressure, and better working conditions." We find that the Company treated Hunter in the manner described above because of his Union activities and, by forcing him to quit on September 30, 1967, constructively discharged him because of his union affiliation.

48. A. Louis Elwood Futrell was employed by the Company from April 1963 until October 12, 1970; from June 1966, he worked as a rechecker in the bookfold tubing department. On December 1, 1969, the Board listed Futrell as a witness in its pre-trial presentation in the instant proceeding, indicating therein that Futrell had given a Board investigating agent a statement. On January 2, 1970, Futrell, who had never before been reprimanded in any way by the Company, received his first write-up from supervisor David Jones for allowing cloth to pass that had picks running through it. As previously noted (see Finding 47A), the Company permitted its recheckers broad discretion in determining what could go to the customers

as first quality goods. In this instance the cloth had not been returned by the customer, but the picks had been discovered before it left the plant; and the defect was so minor that neither Futrell nor Herbert Aycock, a rechecker on another piece of the same cloth, noticed it.

B. On February 17, 1970, Futrell received another personnel action report from supervisor Jones, this time for uneven nap; Futrell, who had shipped similar cloth in the past, and still considered the cloth first quality, refused to sign the write-up. On March 10, 1970, Futrell received his third written reprimand, for allowing a beam of cloth to be folded open-width rather than book-fold, i. e., folded with a crease down the middle. Futrell was not the only employee responsible for this error, but he was the one who discovered it. Moreover, this was a commonplace mistake and in the past, a rechecker simply refolded the cloth, or reframed it if necessary the correct way, but was never written up for the error by his superior. Futrell was reprimanded again on June 3, 1970, this time because cloth he had rechecked had been returned by a customer; as indicated previously, it had never been the Company's practice to write up a rechecker for defects in cloth even if the cloth was sent back by the customer.

C. On August 20, 1970, Futrell received a write-up because, during his break, he brought a soft drink to Doris Lanier, a fellow employee in an adjacent department. It was, however, common practice both before and after Futrell received his reprimand for employees in the two departments to visit with each other under similar circumstances, without criticism from management. Subsequently, on another occasion Futrell was engaged in conversation with Lanier when the shift starting buzzer sounded, and he arrived at his work station late; even though the practice among many employees was to start work a few minutes late, Futrell was criticized for this by supervisor George Sholar, and was told several days later by supervisor Jones that he would be written up again.

D. We find that beginning in January 1970, the Company issued written reprimands to employee Futrell and was more exacting of him than of other employees because Futrell gave Board agents a statement and was scheduled by the Board to be a witness in the instant proceeding.

49. On Friday, October 9, 1970, Futrell was working an extremely busy shift, when the tuber whose work he was checking indicated that Futrell should inspect a new lot of cloth. Later on that evening Futrell discovered that the cloth was folded book-width (creased) when it should have been folded open-width. Although Futrell was partly responsible for this error, it was also attributable to the scheduler and to the tuber. On October 12, 1970, supervisor McDonald told Futrell that "due to circumstances," the Company could not use him anymore. As previously noted, it was not uncommon for cloth to be misfolded, and no employee was written up for this prior to the Company's campaign of harassment against Futrell; nor, on this occasion, did the Company reprimand, let alone discharge, the employees who were responsible for misfolding the cloth together with Futrell. We find that the Company discharged Futrell on October 14, 1970, because he cooperated with the Board in the instant proceeding by giving it a statement and because he was listed by the Board to be a witness herein.

## II. CONCLUSIONS OF LAW

1. By engaging in interference, restraint, and coercion, respondent Company has engaged in unfair labor practices within the meaning of section 8(a) (1) of the Act and in violation of the aforesaid decrees of this court.

2. By discriminating in regard to terms and conditions of employment of, and ultimately discharging, employees Bobby Thompson, William Nivens, Gladys Whitener, James Jones, Doris Bowers, Shirley Hobbs, James Biby, Charles Epley and Harry Nelson Hunter,

respondent Company has discouraged membership in the Union and engaged in unfair labor practices within the meaning of sections 8(a) (3) and (1) of the Act and the aforesaid decrees of this court.

3. By discriminating in regard to the terms and conditions of employment of employee Louis Elwood Futrell, and by discharging employee Futrell, because he cooperated with the National Labor Relations Board in the investigation of the instant proceeding by giving an affidavit to Board investigators and was named as witness herein, respondent Company has engaged in unfair labor practices within the meaning of sections 8(a) (4), 8(a) (3) and (1) of the Act and the aforesaid decrees of this court.

4. By acting in concert and participation with respondent Company in the commission of the unfair labor practices referred to above, with notice and knowledge of the underlying decrees, respondents Max Bowers, by his conduct described in Findings 5, 6 and 9, Mason Lee, by his conduct described in Findings 30 and 33, Edna Parrish, by her conduct described in Findings 30 and 31, Marshall Cox, by his conduct described in Findings 30 and 31, Tommy Gardner, by his conduct described in Findings 30 and 31, and Robert "Pete" Rawlings, by his conduct described in Findings 30 and 33, engaged in unfair labor practices in violation of the Act and the aforesaid decrees of this court.

5. By engaging in such conduct, the Company, Max Bowers, Mason Lee, Edna Parrish, Marshall Cox, Tommy Gardner, and Robert "Pete" Rawlings, were and are, in civil contempt of the decrees of this court dated September 1, 1967 and March 26, 1968.

### III. RELIEF

On the basis of the foregoing, the Company, Max Bowers, Mason Lee, Edna Parrish, Marshall Cox, Tommy Gardner and Robert "Pete" Rawlings are adjudged in civil contempt of the decrees of this court dated September 1,

1967 and March 26, 1968, and are required to purge themselves as prayed in the Board's Second Amended Motion insofar as is consistent with the above findings and conclusions.