J. P. STEVENS AND COMPANY, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

TEXTILE WORKERS UNION OF AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 75–1830, 75–2058.

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1976.

Decided Sept. 17, 1976.

Whiteford S. Blakeney, Charlotte, N.C. (Blakeney, Alexander & Machen, Charlotte, N.C., on brief), for petitioner in No. 75–1830.

Jeffrey L. Gibbs, Washington, D.C. (Elliot Bredhoff, Bredhoff, Cushman, Gottesman & Cohen, Washington, D.C., and Henry C. Woicik on brief), for petitioner in No. 75–2058.

Howard E. Perlstein, Washington, D.C. (Alan D. Cirker, John S. Irving, Jr., Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., on brief), for respondent in Nos. 75–1830 and 75–2058.

Before CRAVEN, FIELD and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

Before us for review are the decisions and orders of the National Labor Relations Board that J. P. Stevens and Company, Inc. (the Company) unlawfully discharged employee Doris Barber at its Turnersburg, North Carolina plant, unlawfully interrogated and threatened employee David Thredgill at a Wallace, South Carolina plant, and lawfully discharged twenty-two employees at its Wallace, South Carolina plants. We enforce the orders of the Board and deny petitions for review filed by the Company and the Union.

A representation election to be conducted by the Board was scheduled for November 22, 1972 among the employees at the Company's plant in Turnersburg, North Carolina. Two days before the election, the plant manager gave a lawful speech opposing the union before each of the plant's three shifts. During the speech before the third shift, employee Becky Watson interrupted the speaker with a question. The speaker responded, "[T]his is not a question and answer meeting . . . I would like to continue." Watson said, "[T]he union answers our questions," and the speaker continued, refusing to comment. At that point, employee Barber blurted out that she "would still like for you to answer her [Watson's] question." When the speaker reiterated that the meeting was not for questions and answers, Barber repeated her statement. The speaker told her to remain silent or return to her shift. When Barber declined, the speaker adjourned the meeting and, later in his office, discharged Barber for disrupting the meeting by "repeatedly stating that she wanted an answer to the question." Watson was not disciplined.

Three days before a scheduled September 19, 1973 representation election among the employees at the Wallace, South Carolina plants (Delta No. 2 and Delta No. 3), the Union held a rally and distributed copies of a magazine article which stated that an employee could not be discharged for insisting on the right to ask questions during an employer's lawful pre-election speech. The employee organizing committee and the Union's organizers prepared and circulated a list of questions to be asked during such speeches.

On September 17, 1973, two days before the scheduled election, the Company conducted a series of lawful speeches opposing the Union for all shifts at both Delta No. 2 and Delta No. 3 plants. Immediately after the speeches began, employees rose to seek recognition and ask questions. Even

though the speakers did not reply, employees continued to ask questions. Some of the same questions were repeated on different shifts.

The speaker was able to finish his speech to the first shift at the Delta No. 3 plant, and none of the three questioners was discharged. The speaker at Delta No. 2 was unable to continue his speech to the first shift, and eight employees who had refused to sit down when asked were discharged. The speaker reconvened the meeting with Delta No. 2's first shift, but the questions prevented him from speaking. Six employees who refused to sit down after repeated requests were discharged.

The speaker was similarly prevented from speaking to the second shift employees at Delta No. 2, and following adjournment four employees who continued to ask questions and refused repeated requests to sit down were discharged. The speaker reconvened the meeting but two employees who asked questions and who ignored three warnings to cease interrupting and disrupting the meeting were discharged. The speaker then was able to complete his speech. During the speech to the second shift at Delta No. 3, one employee repeatedly asked questions, interrupted, and refused to sit down upon request. That employee was discharged, the meeting was reconvened, and the speech was completed.

The speech to the third shift at Delta No. 3 was completed without interruption, but an employee on the third shift of Delta No. 2 continually interrupted. He refused to sit down even when the speaker promised him five minutes at the end of the speech to reply for the Union. That employee was discharged. In all, twenty-two employees were discharged.

Under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, employees have the right "to engage in . . concerted activities . . . for their mutual aid and protection." But this right cannot be exercised without regard to the employer's undisputed right to maintain discipline in its establishment. See *Republic Aviation Corp. v. N.L.R.B.*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). In determining whether an action is protected, the Board must weigh these rights in a balancing process. See *Boaz Spinning Co. v. N.L. R.B.*, 395 F.2d 512 (5th Cir. 1968). Courts have also held, properly we think, that there may be some leeway for impulsive behavior, so that not every impropriety committed during an organizing campaign, although excessive, necessarily places the employee beyond the protection of the statute. *N.L.R.B. v. Thor Power Tool Co.*, 351 F.2d 584 (7th Cir. 1965). We are of opinion there was substantial evidence to support the decision of the Board in drawing a line between the spontaneous, and thus protected, comments of employee Barber, and the premeditated and intentional, thus not protected, disruption by the twenty-two Wallace employees.

While it may be arguable that Barber's statements, repeated as they were, could only have been premeditated, we note that there is no evidence of a plan on her part to disrupt the meeting. The finding that her statements were spontaneous, and thus not intended to disrupt a lawful activity of the Company, is within the province of the Board. The evidence surrounding Barber's statements is free from any conflict of consequence. The Board may draw reasonable inferences from proven facts. *Radio Officers' Union v. N.L.R.B.*, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). We think the finding that Barber's conduct was spontaneous, as opposed to designed, was not an unreasonable inference from the testimony, although an opposite finding might have been permissible.[1] The same reasoning supports the Board's finding that the acts of the twenty-two Wallace employees were premeditated and intended to disrupt the meeting lawfully called by the Company to express its views. The record is replete with instructions and plans as to how to proceed with questions described by the

---

1. The Board acknowledges that the speaker was under no obligation to answer the question, citing *Livingston Shirt Corp.*, 107 NLRB 400 (1953).

Board as "loaded, loud, and distracting," even down to the wording of them. The questioning, which included seeking recognition with no question in mind, was intended to and did disrupt the meetings.

■ About two months before the September 19, 1973 election at the Wallace plants, David Thredgill, an employee at the Company's Delta No. 3 plant in Wallace, was approached by his supervisor, Monroe Gaskins. Gaskins asked Thredgill if he believed "this stuff that the union people are telling you." Thredgill walked away but Gaskins again approached him, saying that if unions move in plants will close and new industry will by-pass the area, and that "you have got the welfare of your kids to think about." In his testimony, Gaskins denied that he said any plants would close or move. The determination of credibility of witnesses, however, is within the province of the Board, not the reviewing court. *Benson Veneer Co. v. N.L.R.B.*, 398 F.2d 998 (4th Cir. 1968).

■ Where such questioning about an employee's union beliefs is unaccompanied by assurances against reprisals, it may properly be considered coercive and a violation of § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). We are of opinion that the Board's determination that the conversations of Gaskins with Thredgill were coercive interrogations and threats is sustained by the evidence. *N.L.R.B. v. Lifetime Door Co.*, 390 F.2d 272 (4th Cir. 1968), is very nearly on all fours with our case as to the language used, and we see no reason to depart from that decision.

The petitions for review are each denied, and the Board's application for enforcement is granted.[2]

2. We do not avail ourselves of the invitation of the petitioners and the Board to describe our opinion as either following or rejecting *N.L.R.B. v. Prescott Industrial Products Co.*, 500 F.2d 6 (8th Cir. 1974), or the Board order which it declined to enforce, 205 NLRB 51 (1973), which also concerned questioning by an employee during a company speech. In that case, which we distinguish, the questioning by the

employee, variously described as on three to six occasions, was accompanied by requests from the speaker in each instance to be seated and was finally followed by an order to leave the room, which was disobeyed. The questioner was described as "loud and arrogant, pointing his finger at . . . [the speaker], at times 'blatant,' and incoherent."