NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

J. P. STEVENS & CO., INC., and Junior Anderson, Mason Lee, Tommy Gardner, James Alston, Larry Burroughs, Harold Guerry, William Hinton, Ray Mabry, Chester Martin, Ed Mitchum, Ernest Meadows, Dave Moody, Vernon Payne, Troy Quick, Jimmy Martin, Robert Rawlings, Mack Renegar, Max Shaver, Howard Sellers, Allen Shew, Eugene Taylor, John Thomas, Raymond Thompson, Respondents.

No. 671, Dockets 30391, 30914,
31164, 31245.

United States Court of Appeals,
Second Circuit.

Argued Jan. 12, 1977.

Last Brief Submitted March 2, 1977.

Decided Aug. 31, 1977.

Paul Elkind, Asst. Gen. Counsel, N. L. R. B., Washington, D. C. (Kenneth B. Hipp, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on the brief), for petitioner.

Whiteford S. Blakeney, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., of counsel), for respondents.

Before WATERMAN, FRIENDLY and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

 The National Labor Relations Board (NLRB) has again petitioned this court for an order adjudging respondents J. P. Stevens & Co. and certain of its supervisory personnel in civil contempt. The NLRB alleges that respondents have violated the orders of this court entered under our decisions in *J. P. Stevens & Co. v. NLRB*, 380 F.2d 292 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967) (*Stevens* I); *Textile Workers Union of America v. NLRB*, 388 F.2d 896 (2d Cir. 1967), cert. denied sub nom. *J. P. Stevens & Co. v. NLRB*, 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968) (*Stevens* II); and *J. P. Stevens & Co. v. NLRB*, 464 F.2d 1326 (2d Cir. 1972) (per curiam), cert. denied, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973) (*Stevens* XIII). In *Stevens* I and II, we upheld the Board's determination that Stevens had engaged in massive violations of its employees' rights under sections 8(a)(1), (3), and (4), of the National Labor Relations Act, *Stevens* I, supra, 380 F.2d at 301 ; *Stevens* II, supra, 388 F.2d at 903, and we entered orders requiring the Company, in substance, to comply with those sections of the Act.[1] These cases marked only the beginning of Stevens's battle with the union[2] and its lengthy history of litigation in the federal courts that has earned the Company its reputation as the "most notorious recidivist" in the field of labor law.[3] In 1972, we found Stevens and some of its supervisory personnel in civil contempt of our orders in *Stevens* I and II. *Stevens* XIII, supra. Yet barely one year after that adjudication, the NLRB found it necessary to file its petition for contempt in this case.[4]

We appointed Monrad G. Paulsen, then Dean of the Virginia Law School, as Special Master to hear evidence in the case and make findings of fact and law. During

---

1. Those orders are reprinted in the appendix of our opinion in *Stevens* XIII, 464 F.2d 1326, 1329–30 (2d Cir. 1972). The orders are substantially the same, and for the sake of simplicity, we will ordinarily refer only to the March 1968 order entered under *Stevens* II. Similarly, for the purposes of the remedies ordered in this opinion, we need not distinguish between violations of these orders and violations of our prior contempt decree, as found by the Master. The latter violations may, however, justify a more severe compliance fine. See Part II(5) of this opinion, infra.

2. The contempt proceeding in this case will be, absent intervening litigation, *Stevens* XVIII. The first eleven *Stevens* cases are listed in *Textile Workers Union of America v. NLRB*, 154 U.S.App.D.C. 389, 475 F.2d 973, 974 n.1 (1973) (per curiam) (*Stevens* XII). The five subsequent cases are as follows: Our contempt adjudication in *Stevens* XIII, supra, note 1; *J. P. Stevens & Co. v. NLRB*, 547 F.2d 792, 93 L.R.R.M. 2262 (4th Cir. 1976) (*Stevens* XIV and XV); *J. P. Stevens & Co.*, 220 N.L.R.B. 270 (1975) (*Stevens* XVI); *NLRB v. J. P. Stevens & Co. (Gulistan Div.)*, 538 F.2d 1152 (5th Cir. 1976) (*Stevens* XVII).

3. Bartosic & Lanoff, Escalating the Struggle Against Taft-Hartley Contemnors, 39 U.Chi.L. Rev. 255, 256 n.4 (1972).

4. In February 1976, the Board filed another petition for an adjudication of civil contempt against Stevens in this court. At oral argument in this case, the Board appeared to indicate that this petition might be withdrawn, depending on the outcome here.

1974, the Master held hearings in Virginia and in North Carolina, at which he heard testimony relating to alleged violations of the court's order at various Stevens plants in the region. In all, the NLRB presented evidence involving over twenty separate alleged violations at 6 plants. Over 85 witnesses testified before the Master, and the transcript of the hearings consumed over 1,340 pages. In September 1976, the Master filed his 46-page report, sustaining the Board's claims in substantial part.[5] Thereafter, the parties filed extensive briefs and the panel heard oral argument. The NLRB does not challenge the Master's findings, but does except to the Master's failure to provide certain remedies for the violations. Respondents challenge all of the Master's findings that are unfavorable to them.[6]

## I

Respondents attack the Master's findings with their own detailed description of the events, arguing that the Master improperly ignored the evidence that they presented and that he did not apply the correct standard of "clear and convincing" evidence in this civil contempt proceeding. See *Hart Schaffner & Marx v. Alexander's Department Stores, Inc.,* 341 F.2d 101 (2d Cir. 1965). More broadly, respondents claim that the case against them is predicated solely on the axiom that "Stevens should always be ruled against, because it has been ruled against in the past." According to Stevens, the record here actually reveals a

"Company treating employees with careful moderation and restraint." Reading Stevens's and the NLRB's brief, we are once again struck by the "Pirandello-like effect," 380 F.2d at 296, created by the contrasting descriptions of the same events presented by each side.

Unlike our prior contempt adjudication, however, it is not our responsibility to resolve, in the first instance, the conflicting versions of events presented by the Board and respondents.[7] That task was performed by the Master, and we must stress at the outset that our review of his conclusions is a limited one. We must accept the Master's findings of fact unless they are clearly erroneous. *NLRB v. John Zink Co.,* 551 F.2d 799, 801 (10th Cir. 1977); *Oil, Chemical and Atomic Workers International v. NLRB,* 547 F.2d 575, 580 (D.C. Cir. 1976); *NLRB v. J. P. Stevens & Co. (Gulistan Div.),* 538 F.2d 1152, 1160–61 (5th Cir. 1976) (*Stevens* XVII). And "[t]he party excepting to the master's findings carries the burden of proving them to be clearly erroneous." *Oil, Chemical and Atomic Workers,* supra, 547 F.2d at 580. Of course, the Master's conclusions of law are entitled to no such deference. Id. With these principles in mind, we believe that each of the Master's findings of violations of our prior decree must be upheld.

### Violations at the Turnersburg Plant

The Master found three separate violations at the Turnersburg Plant in

---

5. For examples of instances where the Master found against the NLRB, see notes 12, 13 and 19, infra.

6. After oral argument, respondents filed a motion in this court for an order "implementing the geographic limitations applicable to contempt proceedings" in this case. They argued that the cease and desist provisions of our prior orders were limited to those plants where violations occurred, since that limitation was, allegedly, included in the original NLRB orders that our decrees enforced. We reject this argument and deny the motion. Our cease and desist orders made no reference to any specific geographic location, and until this motion, both parties had interpreted the orders as applying, at least, to Stevens's plants in North and South Carolina. Even if it were to be assumed ar-

guendo that this court's cease and desist orders should have been limited geographically, those orders issued approximately ten years ago, and the Company's motion must be denied as a collateral attack upon these decrees. See *NLRB v. Local 282, Teamsters,* 428 F.2d 994, 998–99 (2d Cir. 1970). By analogy to Fed.R. Civ.P. 60(b), our decrees were not "void" under Rule 60(b)(4), and there is no "other reason justifying relief from the operation of the judgment," under Rule 60(b)(6).

7. We performed the fact-finding function in *Stevens* XIII, supra, because of the unfortunate death of the Master in that case, Judge Edwin M. Stanley, after evidentiary hearings had been completed. 464 F.2d at 1328.

North Carolina of our decree ordering Stevens to cease and desist from "[i]n any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization . . . ." Specifically, the Master ruled that respondents prevented certain employees from distributing union leaflets during their off hours and that these "actions were undertaken with the purpose of interfering with the lawful union activities of employees."

The incident involving employees Tulbert and Dishmond is typical. On the evening before a scheduled NLRB election, off-shift employees Tulbert and Dishmond were distributing union leaflets on Stevens property, but in a non-work area. Two supervisors approached the employees and told them to leave the plant property and go to the road to hand out their leaflets, which they did. Respondents stress that no disciplinary action was taken against the employees in this case or in any of the other cases at the Turnersburg Plant. But that observation misses the point. Interference with employees' lawful union activities need not result in an outright discharge before our order would be violated. Instead, our order prohibits any discriminatory interference. The crux of the Master's finding was that respondents' actions were not taken in accordance with any published Company rule, disseminated to the employees, prohibiting such solicitation. Furthermore, no such rule against solicitation in non-work areas was, as a practical matter, ever enforced against any employee, unless union activity was involved. The Master found that

The Company's agents had regularly tolerated substantially similar use of the plant area, even the work areas, to product sales and collection, they sought to enforce such "policy" as the Company had only when union organizing activity took place.

The Company responds that it would be impractical for it to publish rules dealing with all the situations that might arise with respect to solicitations and that its supervisors cannot be held responsible for knowing the "shifting sands" of labor law doctrine on where union leafletting activity may or may not occur.[8] Yet whatever the intricacies of labor law doctrine may be, it is clear that an employer may not impose "rules" on the distribution of literature which prohibits union leafletting but not other similar kinds of solicitation. See *Stevens* XIII, supra, 464 F.2d at 1336.

Nor is there any indication, as the Company implies, that the Master ignored evidence which showed that the Company had been trying to curb non-union, as well as union, solicitation on plant property. The Master specifically referred to that evidence, but pointed out that the "record is replete with evidence that no serious attempt was made by management to stop such selling [non-union solicitations] both before and after the union election." In short, as the Master found, the clear and convincing evidence on the record showed a marked contrast between the Company's relaxed attitude towards non-union solicitation and its enforcement of rules against solicitation when union activity was involved. This discriminatory enforcement of its rules constitutes a violation of our prior order.

---

8. Stevens particularly objects to a violation found in another incident when two supervisors told employees Tulbert and Imes that they were not allowed to hand out union literature in the plant on the day of an election. But under longstanding Board principles, leafletting, such as that involved here, is permitted activity during an election, unless it takes place within a certain distance from the polls. See *NLRB v. Dallas City Packing Co.*, 251 F.2d 663, 666 (5th Cir. 1958); *Marvil International Security Service*, 173 N.L.R.B. 1260 (1963). Stevens does not argue that the leafletting was impermissibly close to the polls; instead, it emphasizes that, after the employees refused to comply with the supervisors' instructions, they were told to stop leafletting by the Board's own agent in charge of overseeing the election. But the Board's agent did not ratify the supervisors' earlier attempts to prevent the leafletting—in fact, he was apparently unaware of them—nor did he investigate the distance between the leafletting activity and the polling place. The agent's actions, therefore, do not negate the earlier violation committed by the supervisors.

**16**

At this point, we must pause and address two of the recurring issues presented by this case—Stevens's history of labor law violations in this and other courts [9] and the respondents' contention that, in order to be found in contempt, they must be found to have willfully violated our prior orders. With respect to the first issue, Stevens has expressed its concern that, because of its reputation as a continuous flagrant violator of the labor laws, otherwise innocent or innocuous actions will be misinterpreted and transformed into violations of our past decrees. We are sensitive to this concern, but at the same time, we cannot allow, through a peculiar inversion of logic, Stevens's well earned reputation to shield it from findings of present violations. Here, for instance, it must be remembered that in our prior opinion holding Stevens in contempt, we found similar instances of selective enforcement of the Company's rules against solicitation. 464 F.2d at 1336. This prior holding does not directly add to the factual basis supporting the Master's conclusion, but it does provide a necessary background for assessing the Company's actions. On a practical level, the Company argues that its unwritten rules give its supervisors leeway so that its solicitation policy can conform to "common sense." Yet, the prior contempt proceeding before this court and Stevens's history of litigation unmistakably show that all too often the "common sense" of the Company and its supervisors is antagonistic to the lawful union organizational activities of its employees. By this time, it should be abundantly clear that continued reliance on the supervisor's discretion in these matters does not amount to compliance with our prior decree. Similarly, as the Master noted, "the pro-union employees expected the Company to resist their efforts with retalia-

tory means, an expectation nourished by . . . the Company's past record in respect to union organization." In this atmosphere, rebukes directed against employees for union leafletting may have a decidedly coercive effect, even if no formal disciplinary action follows. Compare, e. g., *Stevens* XVII supra, 538 F.2d at 1163. In short, we believe that, taking all the relevant factors into consideration, including the Company's history of labor law violations, the Master's findings were fully supported by the record.

Respondents argue, however, that, even if there were violations of the order, the violations were not willful, and they maintain that they should not be found in civil contempt unless they acted with deliberate or careless disregard of our prior order. This contention, which is broadly phrased to cover all of the violations at issue in this contempt proceeding, misconstrues the purpose of a civil contempt proceeding where the contemnor is offered the opportunity to purge himself of contempt by complying with prescribed purgation conditions.

In this context, the longstanding rule is that good faith or lack of wilfulness is not a defense that the petitioner must negate. The rule is a salutary one, for the purpose of a motion for civil contempt . . . "is not to punish intentional misconduct, but rather to enforce compliance with an order of the court and to remedy any harm inflicted on one party by the other party's failure to comply." *Oil, Chemical and Atomic Workers*, supra, 547 F.2d at 581 (citations omitted); see also *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949).[10] We see no reason to depart from this "longstanding rule" and therefore, reject the ar-

9. See note 2, supra.

10. Respondents argue that a finding of willfulness is required because "[t]he very essence of typical inquiry under [the National Labor Relations Act] is the ascertainment of the intent and the purpose of the conduct in question." This claim simply confuses the two types of intent that may be involved in a contempt pro-

ceeding. As the Master found, respondents' attempts to prevent union activity, such as leafletting, were undertaken "with the purpose of interfering with the lawful union activities of the employees." The Master did not find, nor was he required to in this civil contempt proceeding, that the respondents also acted in deliberate disregard of our prior orders.

gument that a finding of civil contempt must be based on willful violations.

## The Wallace Plants

The Master found five violations of our prior decree at two Company plants in Wallace, South Carolina. For the most part, these incidents involve the selective enforcement of unpublished Company rules, and require no extensive discussion other than that given above. For instance, employees Hoffman and Walker were handing out union leaflets in the Company parking lot during non-work hours and were told by a supervisor that if they did not stop, they would be fired.

 Similarly, employee Covington, an active union supporter, was stabbed by a fellow employee and then discharged for fighting, ostensibly because of a Company rule that employees involved in a fight should be discharged regardless of who was the aggressor. However, there was no such rule, and the Company eventually "discovered" this fact after the contempt proceedings in this case were started. The Company also claims that the individual responsible for firing Covington was not only misinformed about the supposed Company rule but also was unaware of Covington's association with the union, and that the evidence on this point was "uncontradicted." Yet, Covington testified at some length about his union activity, and the record clearly supports the Master's description of Covington as an employee with "high visibility as a union activist." More than that is not required for a conclusion that the Company discriminated against Covington because he was a union activist.

 There are two incidents, one involving employee John Hunter and the other the so-called "Wallace Motel" incident, that pose somewhat different problems and require some additional discussion. Stevens attacks the Master's finding in the Hunter case as illustrative of the Master's failure to apply the "clear and convincing" evidence

standard and as indicative of "how the grave offense of contempt is lightly and readily found against the Respondents . . . ." At issue is the conflicting testimony of employee Hunter and supervisor Quick. Hunter testified that he went into Quick's office to "dry some shade swatches." While there, Quick addressed Hunter as a man "he could talk to," unlike the other employees—"the boys that want the union . . . and want something for nothing." Quick then asked Hunter whether he had signed a union authorization card at the gate, and Hunter said that he had not, although he had, in fact, signed one at his home. On the following day, Quick approached Hunter and apparently asked him to find out what he could about the Union and report back to him.[11]

On the basis of this testimony, the Master was clearly correct in finding that there had been a coercive interrogation in violation of our prior decree. See *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964) (per curiam). In *Bourne*, we set forth some of the indicia of a coercive interrogation, and those factors are present in this case: The interrogation was conducted by a supervisor in his office; the supervisor was apparently seeking specific information about union activities; there was a background of company hostility towards the union; and Hunter's evasive response to the question whether he had signed a union card "at the gate" suggests that the interrogation did actually inspire fear. See id. at 48.

The Company argues that the Master should not have accepted Hunter's testimony at face value because Quick contradicted it. According to Quick, Hunter brought the shade swatches to his office, but then volunteered information about a fellow employee's affiliation with the union. The Master did not credit this version, noting that it was unlikely that an employee would volunteer information about union supporters. He also found that Quick's credibility was undermined by his statement that the

---

11. Hunter never did act as a spy for Quick, and Quick never pursued his request for information.

Company hierarchy never mentioned anything to him "about keeping the union out." The Company implies that credibility judgments such as this cannot form the basis of clear and convincing evidence, unless the determination of credibility is itself clear and convincing. But this suggestion is based on a misconception of the standard we must apply in reviewing the Master's recommendations. As indicated above, the Master's findings of fact are entitled to great weight in this court, but also entitled to great weight are his determinations of credibility. See, e. g., *NLRB v. Ironworkers Local 25*, 86 L.R.R.M. 2532 (6th Cir. 1973), enforcing Special Master's Report printed at 86 L.R.R.M. 2524 (1973). Thus, it is ordinarily from the testimony *credited by the Master* that our assessment of whether clear and convincing evidence exists must be made. See *Stevens* XVII, supra, 538 F.2d at 1161.

As we said in our prior opinion, "mere numerical superiority of witnesses advancing a particular version of the facts" does not compel either the Master or this court to accept that version. *Stevens* XIII, supra, 464 F.2d at 1328. Instead, the Master could properly base his finding on the version that was "more internally consistent . . . or, on the whole, a far more plausible account of the events in question." Id. That is precisely what the Master did in this case, and he carefully explained his reasons for preferring Hunter's testimony over Quick's. Nor is there any merit to Stevens's charge that the Master generally accepted the credibility of the NLRB's witnesses rather that the Company's. In fact, there were two other instances of allegedly coercive interrogations conducted by a supervisor at the Wallace plants, yet in both cases, the Master found that the employee's testimony was not entirely credible and dismissed the claim against the Company for lack of clear and convincing evidence.[12] We

find that the Master's conclusion with respect to Hunter must be upheld.

The "Wallace Motel" incident raises more difficult issues. The evidence, in all relevant respects uncontested, shows that in January 1973, the motel room of a union organizer was placed under electronic surveillance by two members of Stevens's managerial personnel. For much of January, that motel room was the only union meeting place. There is, therefore, little doubt that this surveillance was a blatant violation of this court's order prohibiting "surveillance of employees' activity in response to union organization," and the Company apparently concedes that the two managers involved are in contempt of the order.[13] The Company maintains, however, that it is not responsible for their actions, because it never authorized or approved the "bugging" and because, when it found out that its employees might be involved, it immediately suspended them and posted a notice to that effect.

The claim that the Company is not responsible because it did not authorize the surveillance is without merit. Both individuals involved were at the middle management level of the Company's hierarchy; their actions substantially benefited only the Company; and they acted in the realistic expectation that the surveillance was desired by the Company. Under longstanding precedent, these factors are sufficient to establish the Company's responsibility, regardless of express authorization, see *Air Chute Co. v. NLRB*, 350 F.2d 176, 179 (2d Cir. 1965), and this would be so even if, as some have suggested, a stricter standard for liability for actions of agents applies in a contempt proceeding. Compare *Oil, Chemical and Atomic Workers*, supra, 547 F.2d at 585, with *NLRB v. Schill Steel*

---

12. The employees involved in these cases were Robert Perkins and Ernest Davis.

13. The two individuals, Personnel Manager Harold Guerry and Plant Safety Engineer Larry Burroughs, were found guilty of electronic interception in violation of federal criminal laws.

*United States v. Burroughs & Guerry*, C.R. 73–538 (D.S.C.). A third individual, George M. Burden, was named as a contemnor by the NLRB in connection with this incident, but the Master found that there was no clear and convincing evidence that he had been involved.

*Products, Inc.,* 480 F.2d 586, 594 (5th Cir. 1973).[14]

The Company's final argument is that its published disclaimer "disapproving" of the surveillance and announcing the suspension of the suspected management personnel absolves it of culpability. Generally, an employer may be relieved from accountability for the actions of its agents if its disavowal is "timely, specific, unambiguous, and of sufficient scope to dissolve the coercive consequences of the supervisors' antecedent acts." *Plywood Plastics Co., Inc.,* 110 N.L.R.B. 306, 313 (1954). Here, Stevens's repudiation was timely (apparently four days after the Company was informed that members of its management personnel were under investigation in connection with the surveillance) and specific. The NLRB contends that the disavowal was, however, ambiguous because it implied that the Company only repudiated anti-union activity that was criminal, as opposed to merely violative of the labor laws. We need not, however, parse the notice for ambiguities, because we agree with the Master's statement that Stevens could not "so easily disregard the actions of such persons as actions of the Company," and his implied conclusion that the notice was of insufficient scope. Admittedly, the facts are close, but we believe that the balance is tipped by the extreme intrusiveness of the violation. In a company with an anti-union background such as Stevens's, the employees would be seriously inhibited in expressing support for a union, knowing that managerial personnel had gone so far as to "bug" the union's principal meeting place. The coercive impact of this surveillance could not be alleviated with a general statement of "disapproval." At the very least, the Company should have assured the employees that it would ignore any information obtained through the bugging. The Company, therefore, must be held to have violated our prior order.

*Plants at Roanoke Rapids*

We turn now to the multiple violations that the Master found at the Company's plants at Roanoke Rapids, North Carolina. All but one of these require little discussion. The Master again found instances where the Company enforced non-existing rules against active union supporters in order to interfere with employees' union organizational activities such as leafletting.[15] Also, one employee, Joseph Williams, was suspended, given more difficult work assignments, and eventually discharged because of his union activity, and another employee, Sadie Lewis, was coercively interrogated by a supervisor. The Master also found that a Company-authorized poll among its employees was a violation of the prior order. The poll asked whether a union would "help or hurt." This created an impression of Company surveillance of the employees' union affiliation because, although names were not required, the questionnaire did ask for identifying characteristics such as sex, shift, length of service and supervisor. The Company also misrepresented the results of the poll by saying that there was a majority response in favor of the union in only one of three plants polled, when in fact, if supervisors were not counted, the majority in two of the three plants thought a union would help.[16]

14. The Company asserts that section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, establishes the standard for assessing its liability for the acts of its supervisors in this civil contempt proceeding. This contention is unsupported by any citation and is without merit. See, e. g., *Oil, Chemical and Atomic Workers,* supra, 547 F.2d at 585; *Squillacote v. Local 248, Meat & Allied Food Workers,* 534 F.2d 735, 747–48 (7th Cir. 1976); *NLRB v. Crown Laundry and Dry Cleaners,* 437 F.2d 290, 293 (5th Cir. 1971); see also *Muniz v. Hoffman,* 422 U.S. 454, 457–67, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975) (sections 1–15 of the Norris-LaGuardia Act do not apply to contempt proceedings under the Taft-Hartley Act).

15. E. g., the violations involving employees Palmer and Willie Williams.

16. Although the Master regarded the Company's statement about the questionnaire as "reasonably accurate if supervisory personnel are added," the statement was still misleading even on this hypothesis. In two of the three plants, a majority of those who answered the question thought a union would help.

 The one violation at the Roanoke Rapids plants that requires more discussion involves Crystal Lee Jordan. The Company strenuously protests this violation, devoting proportionately more of its attention to this case than to any other and providing a detailed refutation of the Master's findings. Without responding detail for detail, we believe that the evidence on the record clearly supports the Master's conclusion. Jordan was a member of the In-Plant Organizing Committee and, as the Company admits, an active supporter of the union. The events leading to her discharge took place in late May 1973, when the union organizational drive at the Roanoke plants was at its height. On May 29, Jordan attempted to copy a letter from the Company bulletin board that presented anti-union arguments and advised the reader to "ask your union representative" certain questions. A supervisor told Jordan that she was not allowed to do this, and, according to Jordan, warned her that she would be fired if she did not stop.[17] She stopped. The day after this incident, Jordan was called into her supervisor's office and told that she had taken her break in the wrong canteen. Jordan explained that she thought the employees had the option to eat in the canteen where she had taken her break. The meeting ended amicably, but, as the Master observed, "being called to the office is not an event without distress for union-organizing employees." Shortly after this conversation, Jordan called her union representative on a Company pay phone. Two supervisors approached her and asked her if she had not been told that she could not use the telephone on work time without permission. She said she was not aware of such a rule, and the supervisors decided to "let it go."

That evening, Jordan again attempted to copy the letter from the bulletin board having been informed by her union representative that she had that right. Again, a supervisor told her that she was not allowed to do so, but this time she persisted. According to Jordan, the head of the Company's Fabricating Department, Mason Lee, arrived and threatened to call the police if she did not leave the plant. She refused. Shortly thereafter, she was called into Lee's office and, in the presence of five other supervisors, he began to question her about what she had been doing that evening. Before answering any questions, Jordan demanded to know the names of all those present; they refused, and she in turn refused to talk to them, clapping her hands over her ears. At that point, Lee fired her.

The Company's position with respect to this incident is that Lee had no intention of firing Jordan when he called her into his office and that she was discharged solely because of her conduct when he was trying to question her. The Master considered the Company's evidence and even noted that Jordan's "shrill conduct in the meeting . . . might well be a ground for being fired." The Company evidently believes that this admission proves its point; but the possibility that the Company had a legitimate cause for the discharge does not end the inquiry, for a discharge that is partially motivated by anti-union discrimination is also illegal. See *Stevens* I, supra, 380 F.2d at 300. Here, Jordan's discharge must be considered in context: It occurred after she had been warned several times of alleged violations of spurious rules; Lee had threatened to call the police to remove her from the plant; and when he later questioned her, it was in the company of five supervisors, some of whom had issued the prior warnings to her.[18] These facts clearly support the Master's finding that Jordan's "outburst was . . . brought about by company harassment," and that the outburst was then used as a pretext for the dismissal of an active union organizer in violation of our decree.

---

17. Although the Master found that there was no clear and convincing evidence that such a threat had been made, he found that Jordan had been "authoritatively" told to stop copying and that this constituted a violation of our prior order.

18. The Master also found that approximately one month before her discharge, Jordan had been coercively interrogated by a supervisor in violation of our decree.

We have dealt at such length with the Jordan incident not only because the Company apparently views it as one of the Master's more egregious errors, but also because we believe that it serves as a paradigm of the Company's actions in this case. The pattern of using minor or nonexistent rules to harass union organizers is unmistakable. But even if this pattern were not so clear, it must be remembered that "[t]he issue of bad faith is always difficult to decide; it is seldom possible to be sure of another's state of mind, and the findings of the tribunal of first instance should be especially cogent." *NLRB v. Giannasca*, 119 F.2d 756, 758 (2d Cir. 1941); see also *NLRB v. McNally Bros., Inc.*, 417 F.2d 1029 (2d Cir. 1969) (per curiam).

We have carefully considered all of the Company's arguments against the Master's findings in the other violations found at Roanoke Rapids, as well as the violations in other plants that we have not discussed in detail. As in prior cases, "the evidence of anti-union action is overwhelming in some instances and nearer the borderline in others." *Stevens* II, supra, 388 F.2d at 899.[19] In many instances, the Company has attempted to relitigate the basic factual issues before the Master, or challenge the basis on which he credited or discredited testimony. In none of these cases has the Company shown the Master's determination to be clearly erroneous. Furthermore, our review of the record reveals that in each case the Master carefully applied the "clear and convincing" evidence standard applicable to a civil contempt proceeding. In short, we find Stevens in contempt of our prior order on the basis of the violations detailed in the Master's Report.

## II

■ Having upheld the Master's findings that respondents were in contempt, we turn now to the remedies recommended by his Report. We will focus primarily on the exceptions to those recommendations taken by the NLRB. In part, the Board's exceptions set forth technical deficiencies in the Master's recommendations,[20] but they also present some suggestions for broadening the scope of the remedial order. The impetus behind the Board's major recommendations is its complaint that the Master's proposals are not "broad enough and potent enough" to put an end to Stevens's blatant disregard of this court's orders and of its employees' rights under the National Labor Relations Act. One court has described the efforts at ensuring Stevens's compliance with the Act as "quixotic." *J. P. Stevens & Co. v. NLRB*, 154 U.S.App.D.C. 389, 475 F.2d 973, 974 (1973) (*Stevens* XII). And there is the strong possibility that respondents "deliberately took their chances in ignoring our decrees because they thought it profitable for them to do so." *Stevens* XIII, supra, 464 F.2d at 1329. Stevens's position is that the Board's remedial proposals in this case are far out of proportion

19. In several instances, the Master found that the evidence was insufficient to warrant a finding of contempt under the clear and convincing evidence standard. E. g., incidents involving employees John Williams, Tinsley Hockaday and Edward Daniels. See also notes 12 and 13, supra.

20. Apparently through oversight, the Master's proposals did not include Robert "Pete" Rawlings among the list of 23 contemnors, although he found that Rawlings had coercively interrogated an employee; nor did the Master's "conclusions of law" include the violations arising from the employee survey conducted by the Company. The order entered in this case should include these violations. More significantly, the Master did not provide any remedial relief for the discriminatory discharges of employees Moses Covington, Crystal Lee Jordan, and Joseph Williams; for the suspension of employees Joseph Williams and Cheryl Ann Wasmund; or for the written reprimands or "write-ups" given employees Wasmund and Jimmy Grooms. The employees who were discriminatorily discharged should be offered reinstatement and back pay (we realize that such an offer may have already been made to Covington, but there is no finding before us that the Company's offer was adequate and that determination can be made in a back pay proceeding); the suspended employees should be offered back pay; and any unfavorable personnel reports concerning the above employees arising out of these violations should be purged from the Company's records, as we provided in our prior contempt order. 81 L.R.R.M. at 2286 ¶¶ 2–4.

with the violations alleged and that "as the number and gravity of contempt allegations against Stevens diminish and decline, the Board's demand for sanctions against this Company instead of abating, escalate beyond reason." We do not agree. The record in this case speaks plainly: The violations of employees' rights are less obvious than before, but they still continue in the guise of discriminatory administration of unpublished rules and harassment that is nonetheless coercive for being more subtle. The impression remains that the Company has engaged in a "program of experimentation with disobedience of the law," *McComb v. Jacksonville Paper Co.,* supra, 336 U.S. at 192, 69 S.Ct. at 500.

■ In considering the Master's recommendations for a remedial order, we are not bound by the narrow scope of review applicable to the Master's factual findings, see *Oil, Chemical and Atomic Workers,* supra, 547 F.2d at 580, but instead may accept, reject or modify his recommendations in order to provide "full remedial relief." See *McComb,* supra, 336 U.S. at 193, 69 S.Ct. 497; see generally Bartosic & Lanoff, Escalating the Struggle Against Taft-Hartley Contemnors, 39 U.Chi.L.Rev. 255, 263 n. 48 (1972) and cases cited therein. The Master's proposals are in some respects narrower than the remedies we provided after the finding of contempt in *Stevens* XIII, supra. And some of the Board's proposals go beyond the scope of the *Stevens* XIII order, which is set out at 81 L.R.R.M. 2284. As indicated above, however, the Company has not raised any specific objections to either the Board's proposals or the Master's recommendations.[21]

1. *Notice*

■ Beyond the normal cease and desist order, which the Master suggested and of which we approve, the Master also recommended that the Company mail a copy of the contempt adjudication and an

appropriate Notice to all employees whose plants were involved in the contempt hearing. The Board proposes that this order be extended to all Stevens's plants in North and South Carolina ("statewide"). Following the pattern of our prior orders, see *Stevens* I, supra, 380 F.2d at 304; *Stevens* XIII, Compliance Order, 81 L.R.R.M. at 2286 ¶ 5, we agree with the Board that the mailing requirement should be extended to all Stevens's plants in North and South Carolina. As we have previously noted, " 'there is every reason to anticipate that if not deterred, [the Company] would pursue the same discriminatory policies' throughout the region," *Stevens* I, supra, 380 F.2d at 304 (citations omitted), and this requirement is fully warranted in light of the evidence that the Company's policies "were not determined at individual plant levels alone." Id. As in *Stevens* XIII, the Notice should be signed by Stevens's president, by the chairman of the board, and by the individual respondents, 81 L.R.R.M. at 2286 ¶ 5, and, in addition, by the other members of the board and by the highest managerial official in each of the Company's plants in North and South Carolina, each of whom shall certify that he has read this opinion. The Notice should also be posted, along with a copy of the contempt adjudication, at all of the Company's Carolina plants.

The Board also proposes that the plant managers be required to read the Notice to their employees and that the Company be required to send a letter, signed by the appropriate plant managers, accompanying the Notice, which would be prepared by the Board and which would explain the Notice and the court's adjudication in nontechnical language. In our other decisions, we have discussed our difficulties with the Board's suggestion that a Company official *must* read the Notice, see, e.g., *Stevens* I, supra, 380 F.2d at 304–05, and we also believe that this proposal is unlikely to have any practi-

---

**21.** At oral argument, the Court invited respondents to submit a brief answering the Master and the Board on the issue of remedies. Respondents contented themselves with a three-

page general discussion, broadly claiming that the "sanctions demanded by the Board have no relation to reason or present reality."

cal effect.[22] We therefore adhere to the remedy provided in *Stevens* XIII, 81 L.R. R.M. at 2286 ¶ 8, giving the Company the option of having the Notice read by a Board agent, with the exception that the requirement in this case should apply "statewide." In all other respects, the Board's requested relief as set forth above is granted.

### 2. *Reimbursement and Compliance Statement*

The Company should be required to reimburse the Board for its expenses, including salaries, incurred in this case, as provided in *Stevens* XIII, supra, 81 L.R.R.M. at 2286 ¶ 14. The Company should also pay court costs, including all costs relative to the Master. With respect to the requirement of a compliance statement, the provisions of *Stevens* XIII should apply, id. at 2287 ¶ 13, with the additional requirement that the Company file sworn statements every six months for a period of two years after our order showing what steps have been taken to insure compliance with the order.

### 3. *Formulation of Rules for Employee Conduct and Educational Program for Supervisory Personnel*

The Master's Report recommended that the Company formulate, in cooperation with its employees and in consultation with a Board representative, "the rules which employees must follow in the plants . . . "; and that the Company establish a "continuing program for the proper education of J. P. Stevens management personnel in the area of the rights of union organizers." We find both these remedies essential to this contempt proceeding. The Company's contumacious behavior in this case is rooted in its use of "supervisory discretion." That discretion, nurtured by the Company's long history of unlawful

anti-union activity, has been repeatedly exercised to discourage union participation and interfere with employees' organizational activities. This conduct is difficult to reach through court order, but we believe that the Master's proposals contain a useful and innovative approach.

We start from the proposition that the remedies provided in a civil contempt proceeding are not punitive in nature, but are imposed "to coerce the defendant into compliance with the court's order." *United States v. United Mine Workers,* 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). And in assessing the appropriate remedy, we "must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." Id. at 304, 67 S.Ct. at 701. In this case, the harm threatened by Stevens's continuing violations of our orders cannot be overestimated. The Company has flaunted its disobedience of our orders, undermining respect for this court and for the rights of employees recognized in the National Labor Relations Act. It cannot seriously be maintained that the normal cease and desist order, or even the posting and mailing requirements outlined above, are sufficient to purge the effects of this contempt. Aside from the Company's own repeated violations, the fact is that three of the six supervisors we found in contempt in our prior adjudication are respondents again in this action.[23] The supervisors apparently believe that they are carrying out the Company's will in discriminatorily enforcing unpublished rules against pro-union employees; if we are ever to expect compliance with our orders, they must be disabused of that notion. To the extent possible, therefore, the Company must formulate rules covering areas such as employee solicitation and must make sure

---

**22.** According to the Board, when the Company has had the option of having the Notice read by a Board agent or a Company official, it has chosen the latter. If it chooses that alternative in this case, we believe, as the Board suggests, that a Board agent should be present to insure that the Notice is not improperly read.

**23.** Supervisors Gardner and Rawlings, and department head Mason Lee, see *Stevens* XIII, supra, 464 F.2d at 1348.

that they are widely published; e.g., copies of the rules should be mailed to all present and future employees and posted on bulletin boards. Supervisors, in turn, must be instructed to respect the organizational rights of the employees. We believe, therefore, that there is a pressing need for the remedies proposed by the Master. We disagree only on the scope of the order. The Master apparently suggested that at least a portion of these remedies apply only to the plants where violations occurred. For the reasons given above, however, we believe that a statewide remedy is necessary. The Company should also issue written instructions to its supervisors as provided in our prior compliance order, 81 L.R.R.M. at 2286 ¶ 7.

### 4. Union Access

▪ The Master did not recommend any remedies designed to give the union access to Company employees. Several such remedies were, however, provided in *Stevens* XIII, and we believe that they are once again appropriate and necessary to "dissipate the fear in the atmosphere within the Company's plants generated by its anti-union campaign." *Stevens* II, supra, 388 F.2d at 906. As in *Stevens* XIII, we order that the union be allowed to post notices on plant bulletin boards, 81 L.R.R.M. at 2286–87 ¶ 9;[24] and that the union be allowed to make a speech in response to Company speeches on union representation in all Stevens's Carolina plants, see id. at 2287 ¶ 11 (same remedy but not statewide). With respect to this latter remedy, we agree with the Board that our prior order did not sufficiently protect against the possibility that employees would be afraid of attending a union speech lest they be branded as a

union supporter.[25] Therefore, we accept the Board's suggestion that a union representative have the opportunity to be present at any such Company speech and to address those employees in rebuttal. The union should also have the opportunity to make a pre-election speech, as provided in *Stevens* XIII, id. at ¶ 10, in Stevens's Carolina plants; it is not appropriate, however, as the Board suggests, to require attendance at these speeches.[26]

▪ The Board has also requested that the union be furnished with a list of Stevens's employees, including their names and addresses, wage rates, job descriptions, and date of hire, and that the union be given access to the non-work areas of Stevens's Carolina plants, such as the canteens. A more limited version of the request for a list was granted in *Stevens* XIII, id. at 2287 ¶ 12, where we required that the union be furnished with a list of the names and addresses of the Stevens employees at the five plants involved in the contempt adjudication. In light of the statewide remedies provided throughout this proceeding and the importance of facilitating the communication between the union and the employees that has been frustrated by the Company's contumacious behavior, we believe that this remedy of *Stevens* XIII should be extended to all Stevens's employees in the Carolina plants.[27] The additional information sought by the Board in behalf of the union is, however, unnecessary. The Board points out that such information has been required in other compliance proceedings. *NLRB v. Schill Steel Products,* supra, 480 F.2d at 599; *NLRB v. Johnson Manufacturing Co.,* 511 F.2d 153, 157–58 (5th Cir. 1975). But in both those cases, the court also ordered the employer to recognize the union as the ex-

---

**24.** We accept the Board's suggestion that the union be allowed two years, rather than six months, to make the request for access.

**25.** See *Stevens* XIV, supra, 217 N.L.R.B. at 515, enforced, 547 F.2d 792, 93 L.R.R.M. 2262.

**26.** We grant the Board's request that the Company be required to allow at least another union representative to accompany any representative speaking on behalf of the union.

**27.** The list should include the names and addresses of those employees who will receive the mailing, see discussion at Part II (1), supra, that is, all employees at Stevens's Carolina plants who have worked for, or are presently working for, the Company since the date of the court's order in *Stevens* XIII.

clusive bargaining agent. No such situation exists here; instead, what is involved is a union organizing campaign, and the Board has not shown that the employees' ability to learn the advantages of self-organization is in any way dependent upon the union's access to such additional information as wage rates and job descriptions. See Stevens II, supra, 388 F.2d at 906.

█ On the other hand, we believe that the Board has met this standard with respect to its proposal that the union be allowed access to certain non-work areas of Stevens's Carolina plants. It is apparent from this contempt adjudication that the in-plant organizing activities of Stevens's employees have been frustrated and discriminated against by the Company's policies. We recognize that "[t]he policies of the [National Labor Relations] Act," in the context of a union organizing campaign, do not necessarily call for increased union access to the employees, but "call instead for a change in the plant's atmosphere." Id. But in this case, we believe that the two goals are complementary. Reasonable solicitations for the union should be permitted without the employees' fear that they will be reprimanded or placed under surveillance by their supervisors. Giving the union access to some non-work areas of the plants will help to reduce this atmosphere of fear, and is therefore an appropriate remedy to order in this case.

5. *Compliance Fines*

█ The Board has proposed that a compliance fine of $120,000 for each future violation of our orders and a fine of $5,000 a day for each day the violation continues be imposed on Stevens.[28] The Board excepted to the Master's failure to provide such a remedy, and the Master's Report contains no explanation why a prospective compliance fine was not recommended. It is well-recognized that compliance fines may be assessed in a civil contempt pro-

ceeding, keeping in mind that such fines cannot be punitive in nature. See, e.g., NLRB v. Local 282, I.B.T., 438 F.2d 100 (2d Cir. 1970); Oil, Chemical & Atomic Workers, supra, 547 F.2d at 597–98; NLRB v. Johnson Mfg., supra, 511 F.2d at 158–59. In dealing with civil contemnors, courts have imposed flat fines, see NLRB v. Giannasca, supra, 119 F.2d at 758; fines that may be avoided through compliance with the court's order within a certain number of days, see NLRB v. Johnson Mfg., supra; and, more commonly, fines that are prospective only. See generally Taft-Hartley Contemnors, supra, 39 U.Chi.L.Rev. at 263–66. Furthermore, the arguments in favor of a compliance fine in this case are strong. Stevens has acted in contempt of our court decrees not once but twice, involving over thirty individual violations. Its violations have been described as "massive," "cynical," and "flagrantly contemptuous." There is no need to add any further adjectives to this chorus. We agree with the Board that a prospective compliance fine is necessary in this case in order to insure compliance with our orders.

We recognize, however, that a compliance fine in the amounts suggested by the Board is an extremely serious remedy. Even though respondents have not addressed this issue, see note 21, supra, we believe that they should have another opportunity to show that the Board's figures are unrealistic, and we so provide in the final paragraph of this opinion.

6. *Conclusion*

This case, perhaps destined to be bleakly denominated as Stevens XVIII in the long list of Stevens litigation, has been a troubling one not only because of the violations of the rights of the employees involved, but also because it raises grave doubts about the ability of the courts to make the provisions of the federal labor law work in the

---

**28.** The Board has also requested a compliance fine of $1,000 for each violation and $100 for each day the violation continues for the individual contemnors, particularly the repeat offenders. See note 23, supra.

**26**

face of persistent violations.[29] It is now a decade since first we decided *Stevens* I and *Stevens* II. Since then, the Company has twice been held in contempt of our prior orders, and a third NLRB petition charging contempt has been filed.[30] It is true that the 71 discriminatory discharges in *Stevens* I and the 18 similar discharges in *Stevens* II constituted more blatant anti-union conduct than that now involved. But, the conduct here was illegal nonetheless, in direct violation of orders of this court, and occurred soon after our opinion in the prior contempt case. We do not take lightly the flouting of our orders not once, but twice. Nor can we view with equanimity the refusal of a large employer to abide by the law of the land and refrain from interfering with the rights of its employees. Should there be repetition of the Company's contemptuous conduct in the future, we are quite prepared to consider more drastic sanctions both for the Company and for the individual respondents than those ordered here. In short, we are determined that respondents shall comply with the provisions of the National Labor Relations Act and that the decrees of this court ordering them to do so shall be obeyed.

It is ordered that the Report of the Special Master recommending that respondents be adjudged in civil contempt of the orders and decrees of this court is hereby approved and adopted, as set forth in this opinion. The motion of the Board for adjudication of respondents in civil contempt is, therefore, granted. We direct respondents to purge themselves of contempt as set forth in this opinion. The Board should submit an appropriate order on notice, accompanied by a further, current justification of the amount of the proposed compliance fine. Respondents may submit a counter-order, with any objections to the proposed amount, within 10 days thereafter.

**29.** We note that bills have recently been introduced in Congress that would deny federal contracts to willful violators of the federal labor law. See, e. g., H.R. 8410, 95th Cong., 1st Sess. (1977).

**30.** See note 4, supra. Of course, we express no view on the merits of that petition.